## NETTIE V. BROWN v. STATE.

No. A-866. Opinion Filed May 19, 1913.

(132 Pac. 359.)

1. INDICTMENT AND INFORMATION—Appeal—Harmless Error—Objection to Information—Verification—Jurisdiction—Waiver of Objection. (a) A departure from the form or mode prescribed in the Code of Criminal Procedure in respect to any pleadings or proceedings or any mistake therein will not render a judgment of conviction invalid unless it has actually prejudiced the defendant or tended to prejudice him in respect to his substantial rights.

(b) When an information is not signed by the county attorney, it fails to comply with the requirements of the Code, but under section 6754, Comp. Laws 1909, Rev. Laws, 5799, this defect can only be taken advantage of by demurrer and cannot be raised in the first instance in arrest of judgment.

(c) Jurisdiction of the subject-matter cannot be conferred by consent, and the want of such jurisdiction cannot be waived, but jurisdiction of the person can be conferred by consent and the want of such jurisdiction is waived unless objected to in apt time.

(d) The Code of Criminal Procedure directs that all informations shall be signed by the county attorney. This is required as a guaranty of good faith and to protect a defendant against prosecution by private parties without authority of law; but where a defendant pleads to an information which is not signed by the county attorney, and without objection goes to trial thereon, he waives all right to afterwards object to the information upon this ground, and cannot be heard upon appeal to complain that the information was not signed by the county attorney as directed by law.

(e) It is not necessary for an information in a felony case to be verified by the oath or affirmation of any person. Such

informations rest alone upon a preliminary trial had before an examining magistrate in which the defendant was held to answer the charge against him or the waiver of such examining trial by the defendant.

2. WITNESSES—Competency—Persons Jointly Indicted. Where two or more persons are jointly indicted, the state may use one of such defendants either before or after conviction as a witness against the others without first dismissing the prosecution against such defendant so used as a witness.

3. SAME—Confidential Communications—Attorney—Consent — What Constitutes. (a) Both by the provisions of our statute and by the policy of the law an attorney is not permitted to testify concerning any communication made to him by his client in that relation or his advice thereon without the client's consent.

(b) Where a client takes the witness stand and testifies as to communications made by her to said attorney and as to his advice thereon, such action entirely removes the bond of secrecy provided by law as to communications passing between counsel and client and operates as a consent on the part of such client to the testimony of her said counsel as to what actually transpired between them.

4. EVIDENCE—Competency of Expert—Subject of Expert Testimony—Hypothetical Questions. (a) A witness may be qualified to testify as an expert by studying without practice or by practice without studying; and where a witness has qualified as an expert, based upon studying alone, it is error to reject the testimony of such witness upon the ground that such testimony was not based upon actual experience.

(b) It is not error for the trial court to reject expert testimony which is not applicable to the evidence in the case.

(c) Expert testimony may be given as to matters which come within the actual knowledge of the witness applicable to the evidence in the case, and also in reply to hypothetical questions; but, when given in reply to hypothetical questions, the question asked should be based upon and include all and be limited to the testimony in the case with reference to which the expert testimony is desired.

(d) Hypothetical questions, which do not include all of the material testimony or which include matters not in testimony before the court, should not be propounded to expert witnesses.

5. HOMICIDE—Proof of Corpus Delicti—Evidence—Sufficiency—Admissibility. (a) While it is true that the corpus delicti must be established as an independent fact, beyond a reasonable doubt, yet it is not necessary that it should be proven by direct and positive proof. It may be proven by circumstantial evidence if from all the circumstances the jury are satisfied of the defendant's guilt beyond a reasonable doubt.

(b) For circumstantial evidence held to establish the corpus delicti in a murder case, see opinion.

(c) Where a woman is on trial charged with the murder of her husband, evidence may be admitted showing that she was in love with another man and had maintained illicit relations with him, for the purpose of showing her motives and explaining the conduct of the parties implicated in the entire transaction.

6. **APPEAL—Objection to Juror—Waiver.** Where it appears during the trial of a criminal case that one of the jurors on the panel has been convicted of a felony, and as soon as this discovery is made it is brought to the knowledge of counsel for appellant, and counsel do not promptly challenge said juror and seek to secure his discharge from the jury, appellant cannot after his conviction be heard to complain that such juror was disqualified.

7. **TRIAL—Instruction on Weight of Evidence—Ground for Reversal —Harmless Error.** (a) It is error for the trial court to single out a defendant and charge upon the weight of his testimony, and, where this is done and an exception is reserved to such instruction, a conviction will be reversed if any reasonable theory can be evolved from the testimony upon which the jury might have acquitted the defendant.

(b) Although the court may err in its instructions to the jury, yet if the evidence is conclusive as to the guilt of the defendant, and it appears, upon an inspection of the entire record that the defendant could not have been injured by such error, a new trial will not be granted. It is not necessary that the appellate court should know that such error did not injure the defendant. The common things of life are matters of knowledge. The sacred things of life are matters of belief. If the court find nothing in the record from which it can reasonably believe that the defendant was injured thereby, the conviction should be affirmed, notwithstanding error in the ruling of the trial court.

(c) It is the duty of an appellate court to give judgment without regard to technical errors or defects or to any exceptions which do not affect the substantial rights of the parties.

8. **APPEAL—Decision—Time for Rendering.** The statute directing that this court shall render a decision in each case within three months from the date said cause is submitted is directory and not mandatory.

(Syllabus by the Court.)

*Appeal from District Court, Washington County;*
*John J. Shea, Judge.*

Nettie V. Brown was convicted of murder, and she appeals. Affirmed.

*Charlton & Vandeventer* and *King & Shinn,* for appellant.
*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, J. First. In their brief counsel for appellant claim that "the information in this case has never been signed or verified by the county attorney." As disclosed by the record, the information in this case is as follows:

"State of Oklahoma, Osage County ss.:

"In the District Court of Said County.

"The State of Oklahoma, Plaintiff v. A. P. Brown, Nettie V. Brown, Cora Brumfield, Bert Brumfield, Defendants.

"Comes now L. F. Roberts, county attorney in and for Osage county in the state of Oklahoma, and in the name, and by the authority of, and on behalf of the state of Oklahoma, informs the court, and gives the court to know and understand that on the 28th day of April, in the year of our Lord one thousand nine hundred and nine, in the county of Osage, state of Oklahoma, the said defendants, A. P. Brown, Nettie V. Brown, Cora Brumfield and Bert Brumfield, did then and there knowingly, willfully, feloniously, and with malice aforethought, without authority of law, and with the premeditated design, then and there existing in the minds of the said defendants, A. P. Brown, Nettie V. Brown, Cora Brumfield and Bert Brumfield, to effect the death of one T. H. Brown with a certain deadly and dangerous weapon, to wit, a foot adz, struck the said T. H. Brown on the head and so inflicted and made a mortal wound upon and in the body of him (the said T. H. Brown), of which said mortal wound so inflicted upon him in the manner and form and with the purpose aforesaid the said T. H. Brown instantly died, as were intended by the said defendants, A. P. Brown, Nettie V. Brown, Cora Brumfield and Bert Brumfield, he should contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the state.

"State of Oklahoma, Osage County—ss.:

"F. L. Roberts, being first duly sworn, on oath says that the statements set forth in the within information are true."

Indorsed:

"No. 175. In District Court. Information. State of Oklahoma v. A. P. Brown, Nettie V. Brown, Cora Brumfield, Bert Brumfield, October 25th, 1909. Thos. Leahy, Jr., Clerk.

"Names of Witnesses: Mode Johnson, George Davis, Mrs. E. Powell, Mrs. F. R. Powell, Mrs. Elsie Carson, Mode Jenkins, J. H. Wood, Frank Demerest, Ruby Waters, Mrs. Jenkins, Mrs. Ida Wharton, G. R. Powell, J. H. Busher, Chas. McWhirter, Roy Hooker, George Petit, John Evans, Lee McDonald.

"I have examined the facts in this case and recommend that a warrant do issue.

"L. F. ROBERTS, *County Attorney.*"

In response to the objection that the information in this case was never signed by the county attorney, the Attorney General attempted to amend the record by showing that the original information had been lost and by filing affidavits of the county attorney and other persons who had seen the original information that it was properly signed by the county attorney. Waiving any discussion of the question as to whether or not this record can be amended in this way after being duly certified by the clerk of the district court of Osage county upon a change of venue to Washington county, we think that, even as the record appears without such attempted amendment, the objection now presented is not tenable. It is therefore not necessary for us to discuss the question of the attempted amendment. When the information was originally filed in the district court of Osage county, appellant, before pleading thereto, filed a demurrer to the information, based solely and exclusively upon the ground that such information did not state facts sufficient to charge a public offense against the laws of the state of Oklahoma, and in such demurrer defendant did not complain that the information was not signed or verified by the county attorney as directed by law. In fact, the record shows that the objection that the information was not signed or verified by the county attorney was presented for the first time in this court. If, as a matter of fact, the information was not signed by the county attorney, and appellant desired to avail herself of this defect, it should have been pointed out by demurrer, so that the trial court might have directed the county attorney to sign the information and thereby cure the

alleged error complained of. It is not necessary for us to decide as to whether or not the information in this case is sufficient in this respect, because, unless the signature of the county attorney is jurisdictional, appellant has clearly waived any right which she may have had in the premises, and no possible injury or injustice has been done her. Objections which appear·upon the face of an indictment or information, except those which relate to the jurisdiction of the court, or the subject-matter of the offense, or that the facts stated do not constitute a public offense, must be presented by demurrer, and if not so presented in proper time they are waived.

Section 6747, Comp. Laws 1909, Rev. Laws, 5791, is as follows:

"The defendant may demur to the indictment when it appears upon the face thereof either: (1) That the grand jury by which it was found had no legal authority to inquire into the offense charged, by reason of its not being within the legal jurisdiction of the county or subdivision; (2) that it does not substantially conform to the requirements of this act; (3) that more than one offense is charged in the indictment; (4) that facts stated do not constitute a public offense; (5) that the indictment contains any matter which, if true, would constitute a legal justification or excuse of the offense charged, or other legal bar to the prosecution."

Section 6754, Comp. Laws 1909, Rev. Laws, 5799, is as follows:

"When the objections mentioned in section 6747 appear upon the face of the indictment, they can only be taken by demurrer, except that the objection to the jurisdiction of the court over the subject of the indictment, or that the facts stated do not constitute a public offense, may be taken at the trial, under the plea of not guilty, and in arrest of judgment."

Unless the signature of the county attorney to the information is necessary to give the court jurisdiction of the subject-matter, then where the county attorney fails to sign the information, such information does not conform to the requirements of the statute, and under sections 6747 and 6754 this objection can only be taken advantage of by demurrer and can-

not be raised in arrest of judgment. The only objection to this information which was presented by demurrer in the trial court has been abandoned on appeal and is not mentioned in the brief of counsel for appellant or presented in oral argument. The objections now made to the information, not having been presented in the trial court, are clearly an after-thought on the part of counsel for appellant. The high character of counsel for appellant precludes the idea that these objections really existed in the trial court and that they had been holding them back for the purpose of enabling them to take advantage of the state upon appeal. In fact, it is strong presumptive evidence that the information was properly signed at the time the demurrer in this case was filed, and that the error of which they now complain arose through the carelessness of the district clerk of Osage county in preparing the transcript of the papers on a change of venue to Washington county. But, be that as it may, fairness to the trial judge and justice to the interests of the state require that such objections should have been presented in apt time.

Section 7142, Comp. Laws 1909, Rev. Laws, 6126, is as follows:

"Neither a departure from the form or mode prescribed in this chapter in respect to any pleadings or proceedings, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant or tended to his prejudice, in respect to a substantial right."

Section 6705, Comp. Laws 1909, Rev. Laws, 5747, is as follows:

"No indictment is insufficient, nor can the trial, judgment, or other proceedings thereon be affected, by reason of a defect or imperfection in the matter of form which does not tend to the prejudice of the substantial rights of the defendant upon the merits."

Even if it be true that the information in this case was not signed by the county attorney, counsel for appellant do not claim in their brief that such failure prejudiced or tended to prejudice appellant or deprived her of any substantial right

upon the merits of the case; neither do they show that the failure of the county attorney to sign the information affected the jurisdiction of the court.

In the light of this record and of the statutes hereinbefore quoted, the contention of counsel for appellant cannot be sustained unless it be held that the signature of the county attorney to the information is necessary to give the court jurisdiction of the subject-matter. If this be true the failure of the county attorney to sign the information cannot be waived, for while a defendant may waive jurisdiction so far as his person is concerned, he cannot by consent confer jurisdiction of the subject-matter. But, if the signature of the county attorney is not necessary to confer jurisdiction of the subject-matter, then the failure to demurr to the information for the want of such signature operates as a waiver of this objection. Let us reason about this question by analogy.

Section 5647, Comp. Laws 1909, Rev. Laws, 4758, under the head of Civil Procedure, is as follows:

"Every pleading in a court of record must be subscribed by the party or his attorney."

Suppose a petition in a civil suit is filed which is not signed by the party bringing the suit or his attorney, and the defendant answers said petition and then after trial and judgment seeks for the first time upon appeal to obtain a new trial upon the ground that the original petition was not signed as directed by statute. The answer to such an attempt would be that, if the defendant wishes to avail himself of this objection, he should have filed a motion to strike the unsigned petition from the record before answering the same, and that by answering the petition he had waived the defect complained of. In this enlightened age where the original petition was not signed by the party bringing the suit or by his attorney, and where notwithstanding such want of signature, the defendant had answered fully and the cause had been fairly tried and judgment rendered, and where the objection on account of the want of such signature was raised for the first time upon

appeal, the appellate court who would grant a new trial upon this ground would subject itself to the charge of colluding with counsel for the defendant for the purpose of hindering, delaying, and defeating justice. Such a decision could not be justified upon any principle of reason. Why should not the same rule apply in criminal cases? But it may be said that, if the signature of the county attorney to the information may be waived, why cannot the information itself be waived, and why cannot a defendant come into court and without indictment or information by consent be tried and convicted for an offense? The answer to this question is that the Constitution of this state in mandatory terms provides that no person shall be prosecuted criminally in courts of record for any offense otherwise than by indictment or information.

Article 2, sec. 17, par. 25, Williams' Const. Okla., is as follows:

"No person shall be prosecuted criminally in courts of record for felony or misdemeanor otherwise than by presentment or indictment or by information. No person shall be prosecuted for a felony by information without having had a preliminary examination before an examining magistrate, or having waived such preliminary examination. Prosecution may be instituted in courts not of record upon a duly verified complaint."

There is no constitutional provision directing what an indictment or information shall contain except that section 20, art. 2, par. 28, Williams' Const. Okla., directs that a defendant "shall be informed of the nature and cause of the accusation against him."

Section 6574, Comp. Laws 1909, defines an information as follows:

"The information is the allegation in writing, made to a magistrate, that a person has been guilty of some designated public offense and is amendable."

As to whether or not the allegations contained in an information are sufficient to charge an offense, we must look to section 6704, Comp. Laws 1909, which is as follows:

"The indictment is sufficient if it can be understood therefrom:

"1. That it is entitled in a court having authority to receive it, though the name of the court be not stated.

"2. That it was found by a grand jury of the county or subdivision in which the court was held.

"3. That the defendant is named, or if his name cannot be discovered, that he is described by fictitious name, with the statement that his true name is to the jury unknown.

"4. That the offense was committed at some place within the jurisdiction of the court, except where the act, though done without the local jurisdiction of the county or subdivision, is triable therein.

"5. That the offense was committed at some time prior to the time of finding the indictment.

"6. That the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended.

"7. That the act or omission charged as the offense, is stated with such a degree of certainty, as to enable the court to pronounce judgment upon a conviction according to the right of the case."

The statute requiring that an information shall be signed by the county attorney will be found in an entirely separate and distinct paragraph.

Section 6644, Comp. Laws 1909, is as follows:

"The county attorney shall subscribe his name to informations filed in the county or district court and indorse thereon the names of the witnesses known to him at the time of filing the same. He shall also indorse thereon the names of such other witnesses as may afterwards become known to him, at such time before the trial as the court may by rule prescribe. All informations shall be verified by the oath of the prosecuting attorney, complainant or some other person."

In this connection it is worthy of remark that this section was intended to apply to misdemeanors only, for when it was enacted misdemeanors only could be prosecuted by information. The prosecution of felonies by information rests

alone upon the Constitution of the state. See *In re McNaught,* 1 Okla. Cr. 528, 99 Pac. 241. But for the sake of argument and owing to the analogies of the law, we will. assume that the direction that an information should be signed by the county attorney applies as well to felonies as to misdemeanors. From the last statute quoted it is clear that, while the law requires that an information in misdemeanor cases shall be signed by the county attorney, yet such signature is no more a part of the information proper than are the names of the witnesses indorsed thereon at the time of filing the same or than are the names of such other witnesses as may afterwards be indorsed thereon by him under permission of the trial court, and that the verification of the information is also not a part of the information itself. While none of these things constitute a part of the information proper, yet they are directed by the statute for the protection of the defendant. Going to the reason of things, the signature of the county attorney is a guaranty that the prosecution is being conducted in good faith by the state and that it is not the work of private persons. The indorsement of the names of the witnesses on the information is to give the defendant an opportunity to find out what the testimony against him will be, and also to investigate the character of the witnesses to be used by the state. The verification of the information is required because under our law the warrant issues in such cases upon the information, and our Constitution declares that "no warrant shall issue but upon probable cause supported by oath or affirmation, describing as particularly as may be the place to be searched, and the person or thing to be seized." See Williams' Const. of Okla., art. 2, sec. 30, par. 38. For a full discussion of the necessity of the verification of an information in misdemeanor cases, see *Salter v. State,* 2 Okla. Cr. 464, 102 Pac. 719, 139 Am. St. Rep. 935; *De Graff v. State,* 2 Okla. Cr. 519, 103 Pac. 538.

Here we have in a nutshell the philosophy of the law of Oklahoma with reference to those things which, while not

constituting a part of the information itself, should be indorsed on it. None of them are essential to the jurisdiction of the court so far as the subject-matter of the offense is concerned. They all relate to personal privileges of the defendant. It is not our business to harmonize the conflicting opinions of other courts. These conflicts have been largely produced by judges who, parrot like, were trying to repeat precedents without understanding or taking time to investigate the ground upon which they rest. It is our duty to decide cases upon principle, and in doing this we are concerned alone with the statute law and Constitution of Oklahoma. The appellate court, which is wanting in the ability and the courage to independently construe the laws of its own state strictly with a view to the administration of justice, should be abolished, or there should be a change in its membership. Our views on this subject are well expressed in an opinion by Judge Richardson, and which we think presents an unanswerable argument in support of the position we have assumed.

*In Re Talley*, 4 Okla. Cr. 409, 112 Pac. 40, 31 L. R. A. (N. S.) 805, Judge Richardson said:

"We take it as established, therefore, both on principle and by the authorities, that a defendant waives any objection which he may have to the information on account of a defective verification thereof, or a total want of verification, by pleading thereto without moving to quash or set aside the information on that ground. He thereby admits what the verification is intended to show, namely, that there exists probable cause to believe him guilty; * * * and, after pleading to such information, he can no more take advantage of its want of verification than he could then take advantage of the fact that the indictment, if he were being prosecuted by indictment, was returned by the grand jury without hearing any evidence, or that the indictment was not indorsed 'a true bill' and signed by the foreman of the grand jury, both of which matters, by the terms of the statute, are waived unless a timely motion to set aside is filed. It was even held by the Supreme Court of the United States in an opinion by Justice Brewer in the case of *In re Wilson*, 140 U. S. 575 [11 Sup. Ct. 870] 35 L. Ed. 513, that if the law required that a grand jury be composed of not less

than 17 nor more than 23 members, and a 'grand jury composed of only 15 members returned an indictment, 'the defect in the number of grand jurors did not vitiate the entire proceedings, so that they could be challenged collaterally on *habeas corpus*, but it was only a matter of error to be corrected by proceedings in error;' and that 'it is doubtful, at least, whether such defect is not waived if not taken advantage of before trial and judgment.' "

So far as the objection that the information in this case was not verified is concerned, even if such verification were necessary, the want of verification was waived by pleading to the information and cannot be raised thereafter. But such verification was not necessary in this case. The information in a felony case is not based upon a personal verification but rests alone upon a preliminary trial before an examining magistrate, in which the defendant was held to answer, or the waiver of such examination by the defendant, and it is not necessary that the information should allege that such preliminary trial was had or waived. The question was discussed and settled in the early case of *Canard v. State*, 2 Okla. Cr. 505, 103 Pac. 737, 881, 139 Am. St. Rep. 949. After an exhaustive discussion and citation of authorities in that case, Judge Owen, speaking for the court, said:

"It is not necessary, in order to give the court jurisdiction, to aver in the information an examination and commitment or holding to bail of the defendant. It is a matter of defense, and defendant may avail himself of the failure to proceed by examination and commitment or holding to bail by a plea in abatement."

See, also, *Caples v. State*, 3 Okla. Cr. 72, 104 Pac. 493, 26 L. R. A. (N. S.) 1033; *Gregg v. State*, 3 Okla. Cr. 409, 106 Pac. 350; *Blair v. State*, 4 Okla. Cr. 359, 111 Pac. 1003; *Heacock v. State*, 4 Okla. Cr. 606, 112 Pac. 949; *Henson v. State*, 5 Okla. Cr. 201, 114 Pac. 630; *Marlin v. State*, 5 Okla. Cr. 355, 114 Pac. 1112.

If the verification of an information in a misdemeanor case can be waived, and if a preliminary trial before an examining

magistrate in a felony case can be waived, with what show of reason can it be said that the signature of the county attorney to an information cannot also be waived? The only ground upon which the contention of counsel for appellant could be sustained would be for this court to hold that the signature of the county attorney was necessary to give the court jurisdiction of the subject-matter. Certainly no one would contend for such an absurb proposition as this. It simply protects a personal right of a defendant, and, if necessary to give jurisdiction of his person, it may be waived, for the law is well settled that, while jurisdiction of the subject-matter cannot be conferred by consent, yet that jurisdiction of the person can be given by consent and is waived if not presented in apt time.

In the case of *Missouri, Oklahoma & Gulf Railway Co. v. D. W. McClellan,* 35 Okla. 609, 130 Pac. 916, in an opinion by Chief Justice Hayes, the doctrine is clearly and distinctly stated that all objections to proceedings and pleadings in civil cases are waived if not presented in apt time, unless it appears that the court has not obtained jurisdiction of the subject-matter, or that the petition fails to state a cause of action, and that these questions may only be raised for the first time upon appeal. We therefore could not sustain the contention of counsel for appellant without disregarding both the spirit and the letter of our statute law and practically reversing every decision which we have heretofore rendered upon this question. We therefore hold that, if the defendant pleads to an unsigned information, he thereby admits that the prosecution is being conducted by the proper officers and waives his right to afterwards complain of this defect. This rule cannot injure an innocent person or deprive him of a single substantial right, and does not in the least interfere with the administration of justice. Any other rule would permit those lawyers who might so desire to juggle with justice and play with loaded dice. Courts should never allow the process of the law to be used for such

purpose. See *Byers v. Territory,* 1 Okla. Cr. 677, 100 Pac. 261, 103 Pac. 532.

Second. Counsel for appellant in their brief say:

"The court erred in permitting A. P. Brown to testify on behalf of the state. A. P. Brown was jointly charged with the plaintiff in error with the joint commission of the crime of murder. The cause was as to this plaintiff in error taken by change of venue to Washington county, but as to A. P. Brown was left in the county where the alleged crime was supposed to have been committed, Osage county. When the state offered A. P. Brown as a witness, the plaintiff in error objected to same and saved her exception when the objection was overruled. * * * The state of Oregon has a section in substance the same as the above, and the courts of that state have repeatedly held that a codefendant must have been tried, or the case against him dismissed, before he would be a competent witness for the state. *State v. White,* 48 Or. 416, 87 Pac. 142; *State v. Drake,* 11 Or. 396, 4 Pac. 1204; 1 Bishop's New Criminal Procedure, sec. 1020, p. 650, and cases cited."

The statutes of Oregon referred to in the brief of counsel for appellant are as follows:

Section 166 of the Criminal Code (D. & L. Gen. Laws) provides that:

"A defendant in a criminal action or proceeding, cannot be a witness for or against himself, nor for or against his co-defendant, except as provided in sections 162 and 163."

Section 162 provides:

"When two or more persons are charged in the same indictment, the court may, at any time before the defendant has gone into his defense, on the application of the district attorney, direct any defendant to be discharged from the indictment, so that he may be a witness for the state."

And section 163 provides:

"When two or more persons are charged in the same indictment, and the court is of the opinion that, in regard to a particular defendant, there is not sufficient evidence to put him on his defense, it must, if requested by another defendant then on trial, order him to be discharged from the indictment, before the evidence is closed, that he may be a witness for his codefendant."

In the case of *State v. Drake,* 11 Or. 396, 4 Pac. 1204, re-
lied upon by appellant, the defendant Drake was jointly indicted
with Mrs. Mary E. Swartz for the crime of murder. Separate
trials were granted, and the defendant was found guilty as
charged in the indictment. After his conviction the defendant
filed a motion for a new trial in order that he might obtain the
testimony of Mary E. Swartz, his codefendant, who had been
acquitted since his trial. In discussing this question the court
said:

"The case before us is one of an incompetent witness hav-
ing become competent, and the motion is made, not on the
ground of newly discovered evidence, but to obtain the evi-
dence of an acquitted codefendant, whose evidence the defendant
claims is important and now within his power to produce, but
which the rules of law had put beyond his reach at his former
trial. In *Lyles v. State,* 41 Tex. 172, 119 Am. Rep. 38, it was
held that, when there are two parties jointly indicted and tried,
one of whom is acquitted and the other convicted, it is error
in the court below to refuse a new trial to the party convicted
when the motion is sustained by the affidavit of the party ac-
quitted to facts material to his defense, which, by reason of the
joint trial, could not be used in evidence. In *Rich v. State,* 1
Tex. App. 206, two defendants being jointly tried for murder,
one was acquitted, but the other was convicted of murder in the
second degree, whereupon the latter moved for a new trial on
the ground that his acquitted codefendant was a material wit-
ness in his behalf, and supported his motion with the witness'
affidavit disclosing his presence at the encounter and state-
ments respecting it. And it was held that the witness was
rendered competent by his acquittal, and no diligence could have
procured his testimony prior thereto, wherefore if his tes-
timony was material to the defense, there may have been
error in refusing a new trial. In *Williams v. State,* 4 Tex.
App. 5, it is held that when joint defendants sever, if one
be convicted, and subsequently the other be acquitted, ma-
terial testimony of the latter is cause for a new trial of the
former. *Huebner v. State,* 3 Tex. App. 459. Under these au-
thorities, it is immaterial whether the defendants be jointly
or severally tried; if the evidence of the acquitted codefendant
is material, it may furnish a ground for a new trial. But
these cases show that the motion for the new trial must be sus-

tained by the affidavit of the party acquitted to facts material to the defense, and which, as we understand it, would render a different result probable on a retrial. If we were disposed to adopt the reasoning of these cases last cited upon the facts to which they are applied, it could not avail the defendant upon this record. The motion is not supported by the affidavit of the acquitted codefendant, nor are the facts which the defendant alleges he can prove by his acquitted codefendant of that character which would be considered material for his defense, or which would render a different result probable on a retrial. These facts are, at best, cumulative, and would only serve to contradict the state's witnesses. As newly discovered evidence, such facts would be clearly insufficient, and to what other ground they might be assigned under the provisions of our Code for a new trial it is difficult to understand. In *Holcomb v. State,* 8 Lea (Tenn.) 426, the court said: 'We find no authority holding that the one convicted is entitled to a new trial, as a matter of right, in order to have the benefit of the testimony of the one acquitted.' At most, then, it can only be matter resting in judicial discretion, and that this court never reviews, except for abuse of this discretion. Whether a new trial will be granted on behalf of a defendant, convicted in a criminal case, because a codefendant, tried at the same time and acquitted, or, upon severance, subsequently tried and acquitted, is a material witness for the convicted defendant, it is not necessary for us to decide; but conceding, for the purpose of this case, that it would be a matter addressed to the sound judicial discretion of the court below, and in a proper case ought to be allowed, the record here does not show a case in which such discretion has been wrongfully exercised, and therefore the judgment must be affirmed."

In the case of *State v. White,* 48 Or. 416, 87 Pac. 137, relied upon by counsel for appellant, in discussing this question the court said:

"Error is also alleged in the action of the court in overruling the motions to discharge the codefendants, Harry White and Smith, so that they might become witnesses for the defendant. This, however, was a matter, based upon the sufficiency of evidence, within the discretion of the court, and we think there was sufficient evidence to sustain the ruling of the court. Section 1397, B. & C. Comp."

The citation from Bishop's New Cr. Law, relied upon by counsel for appellant, is as follows:

"Sec. 120. (1) A defendant cannot be a witness for or against another defendant, even on a separate trial, until the case as to himself is disposed of by a plea of guilty, or a verdict of conviction or acquittal, or a discharge on a plea in abatement; then he may be, whether sentence is rendered against him or not. Yet, if there are separate indictments, he is competent to testify, though the offense is supposed to be joint. And exceptionally in some of the states, by statutes or otherwise, a joint defendant may testify on the separate trial of another defendant."

If our statutes were in all respects identical with those of Oregon, as is claimed by counsel for appellant, yet the cases cited by them present an entirely different question from that now before the court. In the Oregon cases the defendant was seeking to secure the testimony of a codefendant jointly indicted with him. In the case at bar the state used the testimony of a codefendant. As we will show presently, a radical difference exists between the law of Oklahoma and the law of Oregon touching this matter. Mr. Bishop does correctly state the general common-law rule that a defendant cannot be a witness for or against his codefendant, even on a separate trial, until the case against himself is disposed of by a plea of guilty or a verdict of conviction or acquittal or a discharge on a plea of abatement, but Mr. Bishop goes further and recognizes the exception that in some states, by statutes or otherwise, a joint defendant may testify on the trial of another defendant.

Section 6831, Comp. Laws 1909, is as follows:

"When two or more persons are included in the same indictment, the court may, at any time before the defendants have gone into their defense, on the application of the county attorney, direct any defendant to be discharged from the indictment, that he may be a witness for the state."

Section 6500, Comp. Laws 1909, Rev. Laws, 5549, among other things provides that:

"No person can be compelled in a criminal action to be a witness against himself."

Section 21, art. 2, par. 29, Williams' Const. of Okla., is as follows:

"No person shall be compelled to give evidence which will tend to incriminate him, except as in this Constitution specifically provided; nor shall any person, after having been once acquitted by a jury, be again put in jeopardy of life or liberty for that of which he has been acquitted. Nor shall any person be twice put in jeopardy of life and liberty for the same offense."

Section 27, art. 2, par. 35, Williams' Const. of Okla., is as follows:

"Any person having knowledge or possession of facts that tend to establish the guilt of any other person or corporation charged with an offense against the laws of the state, shall not be excused from giving testimony or producing evidence, when legally called upon so to do, on the ground that it may tend to incriminate him under the laws of the state; but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may so testify or produce evidence."

It is thus seen that, under the provisions of our Constitution, the state can compel any person, whether accused or not, to testify to facts that may tend to establish the guilt of any other person of any offense against the laws of the state, but that such person so compelled to testify can never be prosecuted on such transaction about which he testified or produced evidence. This protection follows and does not precede the giving of such testimony. We therefore hold that the court did not err in permitting the state to introduce the testimony of A. P. Brown, jointly charged with appellant with the commission of this crime, without first requiring the state to dismiss the prosecution against said A. P. Brown. It is therefore immaterial as to whether said witness testified voluntarily and thereby waived this protection, or whether he was compelled to testify by the court and thereby secured protection.

Third. Upon the trial of this cause Hon. R. B. Boone testified for the state that he was an attorney at law in the city of Pawhuska, Okla.; that he had acted as attorney for appellant

in a divorce proceeding; that subsequent to this he had received a letter from appellant asking advice; and that he had replied to this letter giving the advice called for. He then testified as follows:

"Q. I will ask you, Mr. Boone, if you ever had a conversation with Mrs. Brown in which you advised her to deposit any money she might receive from Mr. Brown in the name of some friend? Mr. Charlton: Objected to for the reason that it is a privileged communication and cannot be divulged without the consent of the client. By the Court: Overruled. Mr. Charlton: Exception. A. I did not. Q. I will ask you if you had a conversation with Mrs. Brown concerning what had transpired in Arkansas City on the night of the 17th of March, 1909? A. I did. Q. State what that was. Mr. Charlton: Objected to for the reason that the same is a privileged communication between attorney and client and for the further reason that the same is incompetent, irrelevant, and immaterial. By the Court: Overruled. Mr. Charlton: Exception. A. In consequence of information which I had received I sent for Mrs. Brown and she came to the office. I then told her that I understood that she and Pete had been arrested in Arkansas City charged with illicit intercourse, and that they had pleaded guilty and paid a fine and asked her if it was true, and she said it was not true. I then said to her, 'Mrs. Brown, you know whether it is true or not, but if there is any truth in it then you might as well dismiss that divorce suit, for you will not get a divorce, nor you will not get any of your husband's property, and you will not be entitled to it.' She remained there a little while and told me that Mr. Brown wanted to make up and go West and buy property and have the title made in her, and I did not see her again until the day before the final agreement was signed."

The question presented for decision is as to whether or not, under the circumstances of this case, the trial court erred in requiring Mr. Boone to testify, as disclosed by the record.

Section 257, Comp. Laws 1909, Rev. Laws, 244, among other things provides that it is the duty of an attorney and counsellor at law "to maintain inviolate the confidence, and, at any peril to himself, to preserve the secrets of his client."

Section 5842, Comp. Laws 1909, Rev. Laws, 5050, among other things provides that:

"The following persons shall be incompetent to testify: (4) An attorney, concerning any communication made to him by his client, in that relation, or his advice thereon without the client's consent."

These statutes are but reiterations of the common law and are based upon fundamental principles of justice which are essential to the confidence and freedom without which the relations between counsel and client would be valueless, and the rule forbidding the disclosure of confidential secrets is rigidly enforced as against attorneys in the interests of their clients. But like all other rules this rule has its exceptions. It is based upon reason, and, when the reason underlying a rule ceases to exist, the rule is no longer enforced. In the case at bar the appellant in her testimony went fully into the matter as to what transpired between her attorney and herself and gave her version of the affair. She based her defense in part upon what she claimed had passed between herself and her attorney. Manifest reason and justice then required that the state should be permitted to prove just what did pass between appellant and her attorney. Her testimony entirely removed the band of secrecy as to what passed between her counsel and herself touching this matter and operated as a consent upon her part to the testimony of her said counsel. The reason for this and the authorities on this question are conclusive.

In the case of *Hunt v. Blackburn,* 128 U. S. 470, 9 Sup. Ct. 127, 32 L. Ed. 488, Chief Justice Fuller, speaking for the court said:

"Defendant Blackburn insists, however, in his answer, that the part she took in the litigation of these two cases was the result of misplaced confidence in her counsel, by whom she alleges she was deceived, misadvised, and mislead; that she was ignorant of her rights; and that she ought not to be held estopped in the premises, while at the same time it is objected on her behalf that her attorney, on the ground of privileged communications, should not be permitted to defend himself by tes-

tifying to the facts and circumstances under which he advised her and the advice which he actually gave. The rule which places the seal of secrecy upon communications between client and attorney is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure. But the privilege is that of the client alone, and no rule prohibits the latter from divulging his own secrets; and, if the client has voluntarily waived the privilege, it cannot be insisted on to close the mouth of the attorney. When Mrs. Blackburn entered upon a line of defense which involved what transpired between herself and Mr. Weatherford, and respecting which she testified, she waived her right to object to his giving his own account of the matter. As, for instance, when she says * * * that she has not got it, and that she thinks she gave it to him, it is clear that her letter of July 6, 1875, calling for that deed, and Weatherford's reply of July 14th, inclosing it, are admissible in evidence."

Mr. Wigmore, in his work on Evidence, vol. 4, sec. 2327, in speaking of the same matter, says:

"The privilege is designed to secure the client's confidence in the secrecy of his communications; hence the privilege is not violated by receiving such disclosures as the client by his own will permits to be done."

And again:

"He [client] cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or disclose, but after a certain point his election must remain final."

In the same section this learned author also says:

"The client's offer of his own or the attorney's testimony as to a specific communication to the attorney is a waiver as to all other communications to the attorney, for the privilege of secret consultation is intended only as an incidental means of defense and not as an independent means of attack, and to use it in the latter character is to abandon it in the former."

Also:

"The client's offer of his own or the attorney's testimony

as to a part of any communication to the attorney is a waiver as to the whole of that communication."

As appellant introduced this question into the trial and attempted to defend herself upon alleged advice given her by her counsel, it would violate the reason and principle of the rule to prohibit the state from introducing the testimony of the attorney as to what did pass between them. We therefore hold that the court did not err in admitting the evidence complained of.

Fourth. Upon the trial of this cause Dr. G. F. Woodring, a witness for appellant, was placed upon the stand and testified that he was a regular practicing physician, being a graduate of Louisville Medical College of Louisville, Ky. He then testified as follows:

"Q. Do you know from experience or have you examined the medical authorities as to the weight · of the ashes of an adult? A. Yes, sir; I know by having examined the authorities. Q. You will please state what it is? Mr. Leahy: Objected to as incompetent, irrelevant, and immaterial; the witness having had no actual experience in that line. By the Court: Sustained. Mr. Charlton: Exception. Q. I will ask you, Doctor, what the amount in bulk ashes of a dead body consumed by fire, of a body weighing from 150 to 160 pounds, would amount to? Mr. Leahy: Objected to for the reason that the witness has stated that he has no actual experience. By the Court: Sustained. Mr. Charlton: Exception. Q. I will ask you this question, could the body of a man 52 years old, weighing 150 to 160 pounds, five feet eight inches high, with his clothes ˙on, placed face downward upon a fire made upon the ground, made of limbs and sticks picked up from the ground, part of the body projecting over the fire, and quilts being placed on the body, and it being at or about 12 o'clock at midnight, the fire kept up by putting more wood on as follows: Two armsful of sticks and limbs at 12, and about 2 o'clock two more armsful of sticks and limbs, and two more armsful placed on the body about 3 o'clock—could that body be entirely consumed in six hours? Mr. Leahy: Objected to as not being based upon the evidence. By the Court: Sustained. Mr. Charlton: Exception."

Dr. Woodring testified that, while he had no actual experience in that line, yet from an examination of the authorities he could state the weight of the ashes of an adult, but he was not permitted to answer this question upon objection of counsel for the state, based upon the ground that the witness had no actual experience. We think that this objection was not tenable. A witness may be qualified to testify as an expert by studying without practice or practice without studying. See *Miller v. State, ante,* 131 Pac. 717, decided at the last term of this court. Many of the greatest scientists of this world have very little practical experience. All that they know they have learned from the books. There are also others who are entitled to be classed as scientists who know but little as a matter of theory and whose knowledge is based upon actual experience. It is the possession of scientific knowledge that qualifies an expert to testify and not the means by which this knowledge was acquired. See 17 Cyc. p. 234, and note 78. While the objection made by counsel for the state was not good, yet the trial court did not err in excluding this testimony because it was not applicable to the evidence in this case. No witness for the state had attempted to testify as to the quantity or weight of the ashes found at the place at which the state's evidence shows that the deceased had been murdered and burned. Neither was there any effort to show whether the ashes found there were the ashes of a human being or of wood. The homicide is alleged to have taken place in April. The place where it is said to have occurred was open and exposed to the elements, and the ashes referred to were not found until the following August, some four months afterwards and there is no pretense that the place had not been disturbed and conditions altered in the meantime. Therefore the testimony of an expert as to the weight of the ashes of a human being would be entirely immaterial and would not throw any light upon the subject. The other question asked this witness was not based upon and responsive to the testimony in this case. Where it is desired to introduce the testimony of an expert as to matters not

coming within his personal knowledge, a hypothetical question should be asked the witness, and this question should be based upon and so framed as to include and be responsive to the entire testimony in the case and none other, and thereby make it applicable to the issues before the jury. For hypothetical questions which were properly asked and answered, see *Miller v. State, supra.* A hypothetical question should include and be limited to the testimony in the case. Opinions based upon facts not testified to by witnesses, either in whole or in part, should not be received. Therefore the court did not err in sustaining the objection to the second question asked the witness Woodring.

Appellant placed Dr. Howard C. Webber upon the stand and propounded to him similar questions to those asked Dr. Woodring. The testimony of Dr. Webber was excluded by the trial court. For the reason heretofore given, this ruling of the court was correct.

Fifth. Counsel in their brief say: "The facts testified to in this case are not sufficient in law to establish the *corpus delicti* of the crime charged." This contention is based upon the rule of the common law that there can be no conviction for murder unless the body of the deceased or some vital part thereof has been found and identified. This rule is based upon an ancient arbitrary act of Parliament. It was brought to America in the days of the colonies and is still recognized and followed by the most of the states. See *Commonwealth v. Webster,* 5 Cush. (Mass.) 295, 52 Am. Dec. 711. The law in Oklahoma upon this subject is as follows:

Section 2265, Comp. Laws 1909, Rev. Laws, 2310:

"No person can be convicted of murder or manslaughter, or of aiding suicide, unless the death of the person alleged to have been killed and the fact of the killing by the accused are each established as independent facts beyond a reasonable doubt."

Section 6836, Comp. Laws 1909, Rev. Laws, 5884:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the of-

fense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstance thereof."

The contention of counsel for appellant is that as A. P. Brown was an accomplice in the murder of his father, T. H. Brown, his evidence could not be relied upon to establish the *corpus delicti,* and that the death of T. H. Brown should be proven by other competent evidence. For the sake of argument we will concede this. Counsel .do not show in their brief wherein the evidence offered by the state is insufficient to establish the *corpus delicti,* except that the testimony in support of this must be positive and direct. The law upon this subject is clearly and correctly stated in 12 Cyc. p. 488, as follows:

"(2) To Prove *Corpus Delicti.* It is not necessary that the *corpus delicti* should· be established by direct and positive proof. It may be proved as well by circumstantial evidence, if on all the evidence the jury are satisfied of defendant's guilt beyond a reasonable doubt."

See, also, Russell on Crimes, vol. 3, p. 158:

"It has been considered a rule that no person should be convicted of murder unless the body of the deceased has been found; and a very great judge says, 'I would never convict any person of murder or manslaughter, unless the fact were proven to be done, or at least the body be found dead.' (a) But this rule, it seems, must be taken with some qualifications; and circumstances may be sufficiently strong to show the fact of the murder, though the body has never been ·found."

It was proven in this case that at the time of the alleged homicide appellant was 34 years of age and was the wife of T. H. Brown, having married him in Shelbina, Mo., in 1904; that T. H. Brown at the time of his alleged death was 58 years of age; and that by a previous marriage he had become the father of a number of children, among whom was A. P. Brown, who was about 20 years of age. It was also proven that some marital unpleasantness arose between appellant and T. H. Brown which resulted in her instituting divorce proceedings against him; that during the pendency of these divorce proceedings appellant and A. P. Brown visited the city of Wichita, Kan.; and that while on said trip they stopped in Arkansas City, Kan.,

and that they were arrested in bed together, at night by the officers and that they both pleaded guilty and paid a fine in the police court of Arkansas City for illegal cohabitation with each other. It was also proven that appellant was informed by her attorney that her conduct in Arkansas City would defeat her divorce suit and render it impossible for her to recover any money from T. H. Brown; that thereafter appellant and T. H. Brown adjusted their marital differences and appellant withdrew her suit for divorce and became reconciled to T. H. Brown and again lived with him as his wife; that after this reconciliation T. H. Brown converted all of his property into money, with the exception of some horses and mules and wagons and household goods, and started to leave Osage county, accompanied by appellant, A. P. Brown, and Ruby Waters, a niece of appellant who was about 14 years of age; they traveled overland and had two wagons and 8 head of horses and mules with them; they left their old home on the afternoon of the 28th of April, 1909; that prior to this, on the 10th day of April T. H. Brown drew all of his money out of the bank, which amounted to $2,549.94. It was paid to him in $500 packages, with the exception of some fractional silver and bills in tens and twenties; the packages were fastened with manilla paper and $500 was stamped on the wrapper of each package; Brown put the money in a large envelope and went away with it and never returned it; they proceeded with the journey until the third night, when they camped in Osage county near Aiken's ranch; some strangers visited the camp that night; that they saw appellant, A. P. Brown, Ruby Waters, and T. H. Brown when they left, and this was the last time T. H. Brown was ever seen by any person, except the parties who were immediately concerned in this case, and T. H. Brown has never been heard of since.

Ruby Waters testified that after the visitors left the camp she and appellant slept in a covered wagon, and that A. P. Brown and T. H. Brown made a pallet down pretty close to the fire; that after said witness and appellant had gone to

bed appellant called to A. P. Brown to get her a drink of water; that T. H. Brown replied that he would get the water for her as Pete was in bed; T. H. Brown then brought a drink of water to appellant and asked her to kiss him good-night and upon his request she did so; that witness awoke during the night and told appellant that some one had attempted to grab her throat; that appellant told witness that she was only dreaming; that appellant then called T. H. Brown but did not receive any answer; that appellant then asked A. P. Brown where his father was and he answered he did not know; that he was gone and all of the horses; that the next morning A. P. Brown got the horses and came back and said he wondered where his father was. This witness further testified that she got up in the morning; that T. H. Brown was not there; that she asked where he was and they said they did not have any idea; she said it was very funny he would go away that time of night. Witness got breakfast the next morning but nobody ate any; that they then went on to Bliss and from there to Missouri; that appellant told witness to tell people that T. H. Brown had gone away to Kansas to look for a place.

Elsie Carson testified for the state that she resided at Bliss; that she kept a hotel there; that on Sunday, the 2d day of May, appellant, A. P. Brown, and Ruby Waters came to the hotel of witness in Bliss; they were traveling in wagons; that appellant told witness that her husband had disappeared that night; she said he was not a drinking man; he had been to Ponca City and maybe somebody had knocked him in the head; she said he had left her without a cent of money; he had simply left her a lot of horses and moving stuff; witness then asked appellant if she did not suppose that her husband would come back and take the horses away from her; and appellant replied, "No, I know he won't;" then said, "I don't think he will." Appellant stated to witness that her husband had $19,000 and had gone away with all of it that night and left her without anything; appellant also told witness that she had been out looking for her husband and did not know what

on earth she could do; appellant also told witness that before her husband went away he came to the wagon where she was and kissed her; appellant also told witness that her husband had $19,000 which she did not know he had taken out of the bank, and when she went to the bank she found he had taken the money with him.

T. R. Powell testified for the state that in the early part of May, 1909, A. P. Brown left some wagons and stock at his place near Bliss to pasture and care for; that several weeks after this A. P. Brown and appellant came to the home of witness after the stock and wagons; that witness saw what he took to be a foot adz in one of the wagons; that when appellant and A. P. Brown came to get the horses and wagons from the home of witness, witness assisted them .in harnessing the horses and appellant made a remark about that being the way a widow had to do; that appellant took the stock and wagons from witness and paid for their pasture and keeping; she then said, "This leaves me about strapped."

Eddie Powell testified for the state that she was the wife of T. R. Powell; she also testified to the stock and wagons being left with her husband; there were four head of work horses, two mules, and two colts. This witness also saw what appeared to be a grubbing hoe or foot adz in the wagon; witness also saw appellant when she came with A. P. Brown after the wagons and stock; appellant also told witness that T. H. Brown left her one night while they were in camp; she said he carried off $19,000 and left her broke. Ruby Waters told this witness that T. H. Brown had gone to Kansas to look for a farm; witness told appellant this and appellant made no reply.

Frank Dimmitt testified that he was president of a bank at Shelbina, Mo.; that on the 4th day of May, 1909, appellant deposited $1,200 in his bank; the deposit was made in $10 and $20 bills; she said her husband was down in Oklahoma looking for a location; that when he found it she would go to him; the money was deposited in the name of Bert Brumfield.

J. R. Wood testified that he was president of the Shelbina National Bank; that on May 3, 1909, appellant came into his bank and deposited $1,000 in currency; the deposit was made in the name of Cora Brumfield; she said that they had sold a farm in Oklahoma and were looking for another location.

D. McDonald testified that he was a druggist and resided in Pawhuska; that in June, 1909, he had a conversation with appellant in the post office; that appellant stated to him that she had a dream; that she dreamed there was a letter in the post office for her from T. H. Brown; she showed witness a letter and said, "Here it is." She told witness that T. H. Brown was out West in Wyoming.

It was proven that on the 13th or 14th day of August, 1909, a number of persons accompanied A. P. Brown to the place on Drum creek near Aiken's ranch in Osage county where appellant and T. H. Brown camped the third night after they started out on their trip. The place was all grown up in grass and weeds and they found a place where there had been a big fire. The place where the fire had been had been covered with loose dirt and trash about six or eight inches deep. This dirt and trash extended over a place five or six feet long. In these ashes they found a lot of bones. They also found some teeth and some suspender buckles. The bones, teeth, and other things found in the ashes were offered in evidence. The ashes were blue on top and white on the bottom. From this evidence it is clear that some person was interested in concealing the fact that so large a fire had been built there. This was some time after the fire, for grass had grown over the place. This would raise the inference that any bones which had not been so badly burned as to make recognition impossible had been removed and concealed at some other place. This is another reason why the hypothetical question asked Dr. Woodring was not applicable to the testimony, for it ignored this view and was based upon the assumption that the body was entirely consumed and that, as a matter of fact, no bones remained. This also explains the fact that more bones were not found there. But the bones and

teeth and suspender buckles which were left behind were sufficient, under the circumstances, to establish the fact that the purpose of the fire was as far as possible to consume a human body.

A number of letters written by appellant to A. P. Brown were introduced in evidence, from which the following are selected:

The first was not dated or signed:

"Well Kid I would love to take you in my arms as this looks, so write as soon as you can. I have answered every L & someone has bin a gitting them. be careful what you write.

I love you dear, now and ever,
I have waited patiently,
Do not speak that harsh word 'never,'
Give me hope and say mabe."

"Pawhuska, Okla. Aug. 9. My dear Sweet boy: I got your letter was truly glad to hear from you well Pete I have been having a time I feel all O. K. but I got a head ake well Kid I dont think I can wate intil xmas to get to see you Pete my sweet Boy save your money and look for the futcher well if I only was with you I know I would like it better Kid did you sell your saddle if not send it to me Well I tell you to be careful for I think they are look for you Well Kid you know what we talk about Oh Pete I wish I could see you and have a talk with you Well you aske me what Johns address is Big foot tex or Vines texas You can write at both places to see for he has got folks at Both Places Well my sweet Kid I git the Blues so Bad so Bad some time I dont know where or what to do Well Pet Cora & Bert is as ancus to here from you as I am Well Pete old Vic has took 5 to the Pin for selling whiskey and they found a man on the track kill between nelogany & Pawhuska they got old Pawhuska all in a uprore Well Kid [can't make out the words] they are after me Well burt corne look fine, we have all the wateer mellons and must mellons we can eat. We got one ways 65 lbs Oh Pete burt has stayed by me through thick and thin and even went to jail for me they put him in jaid Well Pete my sweet heart boy I if I could only take you in my arms and tell you just what I want to I would feel better Well I will rell you I would love to write just what is in my mind Pete

send me a little money just for a Blind they are wanting to know so much Well Kid topsy legs is sprained and I have a time with it Well I will close for this time I remain as ever your truly sweet Heart love & kisses to my sweet boy Write soon Pleas tair up all the letter you git from us."

What motive could have prompted appellant to direct A. P. Brown to destroy all letters received from her?

The record in this case covers over 800 pages and it would take too much space to make a full transcript of the testimony. We have therefore contented ourselves by stating the more prominent circumstances.

The evidence is positive and direct that T. H. Brown was last seen by disinterested persons in company with appellant and A. P. Brown at night at a camp near Aiken's ranch in Osage county. There is not a scintilla of evidence in the record that he has ever been seen or heard of since. The statement that he went away during the night and left appellant is an insult to human intelligence and human experience. He only had about $2,500 before leaving Pawhuska. Appellant is proven to have had about this amount of money in her possession when she reached Missouri. Where did she get this money? Why would T. H. Brown leave the camp at night in a penniless condition and on foot? He certainly did not go away on one of the horses, because appellant and A. P. Brown had all of the stock with them when they reached Bliss that T. H. Brown had when he left Pawhuska. There is not a semblance of reason in the statement that T. H. Brown walked off at night and mysteriously disappeared and has never been heard of since. No possible cause for his leaving in any manner appears in the record. According to the testimony, at this time T. H. Brown was on the most amicable relations with appellant. To please her he had broken up his home near Pawhuska, had converted his property into cash, and had started on a trip to make a new home in Missouri. He was evidently very solicitous of her welfare and desired to do all he could to win and retain her favor. When she called A. P. Brown to bring her a drink of water,

T. H. Brown responded in person, and after she drank the water he asked her to kiss him. His last act manifested affection for appellant and was one of loving kindness. All of this is utterly inconsistent with the statement that he voluntarily abandoned her in a penniless condition at night. The statements made by appellant are contradictory, unreasonable, and absolutely untrue. She told a number of persons that T. H. Brown abandoned her at night carrying off with him $19,000 and leaving her in a broken and destitute condition except the stock and wagons which she had in her possession, yet a few days after this she deposited in different banks in Missouri the sum of $2,200. This was only a few hundred dollars less than the amount which T. H. Brown had drawn from the bank a few days before he left Pawhuska. This money was deposited by appellant under fictitious names, and her statements as to where her husband then was were absolutely contradictory of her previous statements about his having abandoned her.

Some four months after the disappearance of T. H. Brown the place from which appellant claimed he had disappeared was examined, and it was found that a large fire had been built there at some time in the spring, for the grass had grown over the place since. There was no necessity at all for building a large fire at the time when appellant and T. H. Brown camped there. The ashes indicated that the place where the fire had been built covered a space five or six feet long. No explanation is made as to why such a large fire was built or was necessary. If it was built for an innocent purpose, why was it that the place where the fire had been built was covered up between six and eight inches deep with loose dirt and trash? What prompted this attempted concealment? Bones, teeth, and suspender buckles were found in the ashes, all of which were introduced in evidence and submitted to the inspection of the jury. It would have been more satisfactory if the testimony for the state with reference to these bones and teeth had been more definite, but they were submitted to the inspection of the jury, which was proper. See *Reed v. Territory*, 1 Okla. Cr. 481,

98 Pac. 583, 129 Am. St. Rep. 861. If there had been any question as to whether or not these bones and teeth were those of a human being, it was the privilege of counsel for appellant to have introduced evidence on this subject. No question of this sort was made in the trial court. Their failure to offer this evidence must be accepted as an admission on their part that the bones and teeth found where the fire had been were those of a human being. In fact, counsel in their brief practically admit this to be true, because they contend that the teeth and charred bones were not identified as those of T. H. Brown. Such indentification would have been impossible. Even under the strictest rule of the common law requiring the identification of the body of the deceased, this was never necessary where the deceased had been killed by being burned to death. We are not willing to establish the doctrine in Oklahoma that there can be no conviction for murder in any case unless the body of the deceased is recognized and identified by direct and positive evidence. Such a rule would make murder safe and would place a premium upon the most vile and brutal kind of assassination. All that the murderer would have to do to escape punishment would be to so mutilate and disfigure the body of his victim, which could be easily done, as to make identification and recognition impossible. Whatever the law in other states may be, this court will never consent to the establishment of a doctrine in Oklahoma which would result in such monstrous consequences.

The only just and logical position consistent with the safety of society and the sanctity of human life which courts can assume is that the *corpus delicti* may be proven by circumstantial evidence.

Another circumstance in this case entitled to great weight and bearing directly upon the *corpus delicti* is the criminal relations existing between A. P. Brown and appellant and the motive which it furnished on their part for the crime committed. A pure woman is the masterpiece and climax of God's creation and as such is regarded by all true men with a feel-

ing of respect which borders upon reverence; but, where the wife is untrue to her conjugal vows and surrenders herself to another, the entire history of the human race shows that there is no crime she will not commit in order that she may gratify her illicit love. It is a principle of human nature that the guilty wife and her no less guilty paramour look with hatred upon the husband whom they have wronged and will do anything within their power to secure his destruction. More murders and crimes have been prompted by illicit love than by any other single cause. It has always been a most prolific source of discord and death. Illicit love has wrecked more kingdoms, subverted more governments, destroyed more homes, and caused more assassinations than any other cause in the history of the human race. Before the beginning of the historic period and in the earliest days of tradition, as we learn from Homer's Iliad, caused by illicit love between Paris, the Prince of Troy, and Helen, the wife of Menelaus, King of Sparta, an entire nation was annihilated. The Trojan war was inaugurated which lasted ten years and which resulted in the destruction of the city of Troy, the proudest and mightiest city of prehistoric times. The incidents of this conflict are recounted by Homer in his Iliad in words of living fire which still warm and thrill the hearts of men. This is the earliest war of which we have any knowledge, either from history or tradition, and it resulted directly from illicit love, and from that day this ignoble passion idelibly leaves behind it the trail of the serpent wherever it goes. What else could be expected, then, but that the unnatural and revolting relations existing between appellant and her stepson should terminate in this most unnatural and revolting murder? They first sought to get rid of T. H. Brown and secure his property through the medium of a divorce proceeding, but, when this plan was defeated on account of their conduct at Arkansas City, they then resorted to the plan of reconciliation between appellant and T. H. Brown and his ultimate murder by appellant and A. P. Brown. The blind confidence of the father and husband caused him to disbelieve, if in fact,

he ever heard of their illicit relations with each other, and rendered him a ready and easy victim to their conspiracy. All of the circumstances in this case point with unerring certainty to the guilt of these parties just as the spokes of a wheel all point to the central hub, and we believe clearly and conclusively establish the *corpus delicti* of this case.

Sixth. It appears from the record that, after the jury was impaneled and the evidence had been introduced, the trial judge received information that one of the jurors had been convicted of a felony in the state of Kansas. He directed the sheriff to bring said juror before him in his private chambers and questioned him touching this matter in the presence of the sheriff. The juror replied that he had been convicted and sentenced to a term in the penitentiary, but that he had been discharged by a pardon, and that he thought the effect of this pardon was to relieve him entirely of this conviction. The trial judge in open court called the attention of counsel for the state and counsel for the defendant to this matter and informed them that the court was of the opinion that this jury was subject to challenge. He then asked counsel for the state what course they desired to pursue. Mr. Leahy for the state said:

"The state announces that it desires to proceed with the trial of this cause and waives any right of challenge to such juror and waives any right to have this juror examined upon this disqualification."

The court then asked counsel for the defendant in open court and in the presence of the defendant what course they desired to pursue. Mr. Charlton, one of the counsel for the defendant, said: "The defendant says nothing." But counsel for appellant now claim in their brief that a new trial should be granted appellant because said juror was disqualified, and that the court erred in not discharging the juror of its own motion. We are of the opinion that the position of counsel for appellant is not tenable. The action of the trial court in this matter is in all respects approved as proper and legal. As this question has been previously passed upon by the Supreme Court

of Oklahoma territory, we are relieved of the necessity of discussing it again.

In the case of *Queenan v. Territory*, 11 Okla. 261, 71 Pac. 218, 61 L. R. A. 324, in an able and well-considered opinion by Judge Hainer, this question was decided adversely to the contention of counsel for appellant. That court held that when one of the jurors in a trial for murder had been convicted of a felony, although cause of challenge proper *de fectum,* it was not a denial of due process of law or of the equal protection of the laws to a person convicted within the meaning of the federal Constitution, and that a known ground of disqualification to a juror before or during the progress of the trial is waived by withholding or refusing or declining to raise the objection until after the verdict. The authorities cited by Judge Hainer and his arguments are in our judgment conclusive of this question, and his opinion is in all things approved and adopted. In Queenan's case the disqualification of the juror was not discovered until after the trial had begun, but the court immediately advised counsel for the defendant of this fact and asked him if he had any objection to make to said juror and if they objected to proceeding with the trial of the case with the jury then impaneled. To this suggestion and inquiry counsel for the defendant said: "We have nothing to say, your honor." So the Queenan case is on all fours with the case now before the court. Queenan's case was appealed to the Supreme Court of the United States, and Judge Hainer's opinion was there ratified and affirmed. *Queenan v. Territory,* 190 U. S. 538, 23 Sup. Ct. 762, 47 L. Ed. 1175.

Seventh. Upon the trial of this cause, the court among other things instructed the jury as follows:

"No. 21. The defendant is a competent witness in her own behalf, and, when she testified as a witness in this case, she became as any other witness, and her credibility is to be tested by and is subject to the same tests as are legally applied to any other witness, and in determining the degree of credibility that should be accorded to the testimony of the defendant the jury

have the right to take into consideration the fact that she is interested in the result of the prosecution as well as her demeanor and conduct on the witness stand.

"No. 22. In arriving at your verdict, you may take into consideration the acts, conduct, and demeanor of the defendant, Nettie V. Brown, as shown in evidence recently before the time of the alleged killing and her acts, conduct, and demeanor after said killing is alleged to have occurred, and you will give to her acts, conduct, and demeanor such weight in arriving at your verdict as you deem them entitled to. But evidence of any other crime does not tend to establish the charge of murder in this case, and is admitted only to show the relations between A. P. Brown and the defendant, Nettie V. Brown, or to show the relations between the defendant, Nettie V. Brown, and her husband, T. H. Brown."

We think it is error for the trial court to single out a defendant and instruct the jury upon the credibility of his testimony. See *Green v. United States,* 2 Okla. Cr. 55, 101 Pac. 112; *Hendrix v. United States,* 2 Okla. Cr. 240, 101 Pac. 125; *Fletcher v. State,* 2 Okla. Cr. 300, 101 Pac. 599, 23 L. R. A. (N. S.) 581; *Bridges v. United States,* 3 Okla. Cr. 64, 104 Pac. 370; *Hughes v. State,* 3 Okla. Cr. 387, 106 Pac. 546; *Crow v. State,* 3 Okla. Cr. 428, 106 Pac. 556.

Such an instruction has also been condemned in numerous other decisions of this court, and if any reasonable theory could be evolved from the testimony in this case, upon which an intelligent, honest, and impartial jury could have acquitted the appellant, we would be compelled to set aside this verdict and grant appellant a new trial. But we are satisfied that this error in the instructions did not work to the injury of appellant, and we are expressly prohibited by statute from reversing a conviction upon any technical error, defect, or exception which did not affect the substantial rights of the defendant.

Section 6957, Comp. Laws 1909, Rev. Laws, 6005, is as follows:

"On an appeal the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties."

We are frequently asked this question: "How do you know that a given error did not deprive a defendant of a substantial right?" Our answer is that the statute does not require us to know anything of the kind. For a full discussion of this question see *Coleman v. State,* 6 Okla. Cr. 252, 118 Pac. 594. If only those cases were to be affirmed which this court knew to be right, all convictions would be reversed. It is always possible in any given case that the conviction may be wrong. Brutes act upon knowledge and instinct. Human beings act upon knowledge and belief. The common things of life are matters of knowledge. The sacred things of life are matters of belief. The dog knows his master, whom he has seen. The human believes in God, whom he has not seen. In all ages men have died for matters of belief. Such a thing as mathematical certainty cannot exist in the enforcement of law. All that courts and juries can act upon is belief to a moral certainty. A moral certainty always admits the possibility of error. Judging from this standpoint, we think the testimony in this case conclusive of the guilt of appellant beyond all reasonable doubt and to a moral certainty, and that in finding appellant guilty of murder the jury reached the only verdict which could have been arrived at from the testimony consistent with reason.

In addition to the evidence already discussed under the head of *corpus delicti,* the state introduced A. P. Brown, the coconspirator of appellant, who testified in this case, and his testimony in all respects was corroborated by and is in harmony with the testimony of the other witnesses in the case. He testified to the illicit relations existing between appellant and himself, and that the agreement between appellant and himself was first that a divorce suit should be brought by appellant against T. H. Brown and that he (A. P. Brown) was to be a witness in behalf of appellant at that trial, but that, owing to the fact that they were caught in the act of adultery in Arkansas City and pleaded guilty and paid a fine for this offense, appellant upon the advice of her counsel had been compelled to withdraw

the divorce suit; that, after appellant and T. H. Brown had become reconciled, appellant and said witness agreed to kill the said T. H. Brown, and in pursuance of such agreement, and in the presence of appellant, and at her suggestion, on the third night after they left Pawhuska said witness killed T. H. Brown by striking him in the head with a foot adz; that his body was then placed upon a fire and wood was piled over it and the body was burned. It is true that appellant deniëd all of this and on the stand persisted in her statement that on the night in question said T. H. Brown mysteriously disappeared from the camp and abandoned appellant. In view of the entire record in this case, the testimony of appellant was a libel on common sense and reason and was properly rejected by the jury. Appellant's evidence was simply unbelievable. We therefore find, from an inspection of the entire record, that appellant was not and could not reasonably have been injured by the error in the charge of the court above complained of.

Some other exceptions were reserved to the charge of the court which are of minor importance. It is not necessary, however, to discuss them in the light of the overwhelming and conclusive character of the testimony as to the guilt of appellant. Unfortunately our laws are not made by perfect men; neither have we perfect judges and perfect juries to enforce them. It is seriously doubted that an absolutely flawless trial from a technical standpoint ever occurred in a hotly contested case in which able counsel were employed by both sides, as is true in this case. If verdicts are to be set aside when they are clearly right upon the evidence simply because the trial court on the spur of the moment, and in the haste of the trial, may have made some errors in its instructions or rulings which could not reasonably have altered the verdict before an honest and intelligent jury, then the enforcement of law would become a farce and courts would become the protectors of criminals. No man should be heard to complain of error unless he can show some reason for believing that he was injured thereby except when such error is jurisdictional. The

members of this court are always disposed to sympathize with any woman in trouble, but we believe that, if we were to allow pity and sympathy to influence our actions in the discharge of our duty, we would thereby commit a crime against society.

We desire to express our high admiration for and appreciation of the zeal and ability manifested by counsel for appellant in the conduct of this case. They have done everything which ingenuity could suggest and have made every argument which learning and ability could enforce. An abler defense has never been made in this court, and the fact that we have been unable to reach the conclusion for which counsel for appellant have contended is no fault of theirs.

Eighth. More than three months have elapsed since this cause was submitted.

Section 1909, Comp. Laws 1909, is as follows:

"Said court shall render a decision in each cause within three months from the date said cause is submitted."

We feel it to be our duty to make a word of explanation as to why the case was not determined sooner. All things considered, this has been the most difficult case submitted to us for decision. It contains a number of questions of great importance and first impression. It must be remembered that when the state of Oklahoma was admitted into the Union it' was composed of two separate and distinct territories joined into one state. In each of these territories a separate and distinct system of criminal law was in force. When this court was organized, our docket was crowded with cases arising under these two different systems. It was our difficult duty, as far as possible, to harmonize these two systems and to mold them into one harmonious whole. To accomplish this purpose the members of this court have worked continuously, without a single vacation, to the limit of human endurance and until the health of one of its members has become seriously impaired. In this work we had no precedents to follow, but were compelled to rely upon our own resources. We therefore determined, as far as possible, to disregard precedents from other

states, which were based upon obsolete conditions, and which were in our judgment not founded upon reason and justice. The view of the members of this court was and still is that Oklahoma should be ruled by the living and not by the dead, and that it was our duty to construe the laws of this state in the light of reason and justice and as far as possible make them applicable to existing conditions. We know we have made mistakes, but we have certainly done the best we could to give the people of Oklahoma a system of criminal jurisprudence based upon reason and justice. The responsibility and mental strain of this work has been constant and terrific, and, notwithtanding the fact that we have been compelled to make our own precedents, yet the records show that we have disposed of a volume of business equal to that of any other court with like number of members in the United States. It has been our earnest desire and effort to dispose of each case submitted as soon as possible, but owing to the great number of cases upon our docket and the fact that we had no knowledge of the merits of any case until it was submitted and argued, and the further fact that so many cases were pressing for submission, that in our desire to dispose of business we unintentionally became overloaded with submitted cases. When this case was first submitted, owing to the great ability of counsel for appellant and the splendid oral arguments made by them, the court was impressed with the idea that this conviction should be reversed, and an opinion to that effect was prepared and handed down, but it was not entirely satisfactory to the members of the court, and therefore it was withdrawn and counsel on both sides were requested by the court to file additional briefs and make additional oral arguments, and this was done. Since then our attention has necessarily been taken up with other important cases also submitted. We felt then, and still think, it was far better to withhold the decision until the court could give the questions involved mature consideration. We believe that the statute requiring us to decide all cases within three months from date of submission is directory, and

we have certainly done our best to comply with it. We believe its purpose was to prevent unreasonable and unnecessary delays. In view of the great number of important cases which have been submitted, and in view of the importance of the questions involved in this case, we simply could not, in justice to the state, dispose of it at an earlier date without neglecting other important cases equally entitled to our attention. When new questions arise we feel it is our duty to get as near as we can to the very truth and justice of the controversy. We are glad to be able to say that this court is now rapidly catching up with its docket, and within a few months it will be relieved of the congested condition in which it has been since statehood. Then there will be no difficulty whatever in complying literally with the statute and deciding every case within the time provided by law. The Supreme Court has found itself in the same difficulty on this very question, and in the case of *David Kinney v. Heatherington,* 38 Okla. —, 131 Pac. 1078, recently decided by that tribunal, in an opinion by Mr. Justice Dunn, the same conclusion was reached as that at which this court has arrived, namely, that the provision requiring all cases to be decided within a given time was directory, not mandatory.

We find no material error in the record. The judgment of the lower court is therefore in all things, affirmed.

DOYLE, J., concurs. ARMSTRONG, P. J., concurs in result.