Argued 12 July, decided 23 October, 1906; rehearing denied January, 1907.

## STATE v. WHITE.

87 Pac. 137.

INDICTMENT—CONJUNCTIVE CHARGE NOT DUPLICITOUS UNLESS THE ACTS CHARGED ARE REPUGNANT.

1. Under the rule established in this state that an information may conjunctively charge acts disjunctively enumerated in a statute, an information charging that defendant forcibly seized, confined, inveigled and kidnapped another is sufficient under Section 1774, B. & C. Comp., subjecting to punishment every person who without lawful authority forcibly seizes and confines another, or inveigles or kidnaps another, with intent to send him out of the state against his will. All the acts charged may be committed in a single kidnapping, since no one is repugnant to any of the others.

RIGHT OF JUDGE TO DISCHARGE ACCEPTED JUROR FOR CAUSE.

2. A trial judge is in duty bound to see that an impartial jury is selected, and to that end he may excuse persons who have been accepted by both sides, if in his judgment they ought not to serve, and for reasons not named in the statute, the discretion thus exercised being subject to review.

DISCHARGING JURORS BY COURT—PEREMPTORY CHALLENGES.

3. The right of peremptory challenge is one of rejection and not of selection, and the fact that a judge sua sponte, over objection and after a party has exhausted his peremptory rights, excuses a juror who has been accepted by both parties, does not constitute error, since the party aggrieved is not thereby deprived of a challenge, and he has no right to insist that any particular juror shall serve.

CRIMINAL LAW—INCIDENTAL EVIDENCE OF OTHER CRIMES.

4. Evidence of other offenses than the one charged is not on that ground incompetent if it is sufficiently connected with the charge under investigation, the jury being properly instructed as to the purpose for which it may be considered.

For instance: In a prosecution for kidnapping, where the jury are instructed at defendant's request that he is not charged with enticing seamen and that he cannot be found guilty of such offense, he is not prejudiced by evidence tending to prove that crime as part of the kidnapping.

WITNESSES—IMPEACHMENT—PARTICULAR WRONGFUL ACTS.

5. Under B. & C. Comp. § 852, providing that a witness may not be impeached by evidence of particular wrongful acts, testimony regarding the desertion of certain witnesses from a ship is inadmissible.

CRIMINAL LAW—EVIDENCE—EXPERTS—COMPETENCY.

6. A witness, who has been a practicing physician and surgeon for 17 years, and who has described a person's bodily condition, may give his opinion as an expert as to the cause of such condition: State v. Simonis, 39 Or. 114, distinguished.

HEARSAY EVIDENCE—HARMLESS ERROR.

7. Error in admitting hearsay evidence is harmless where the same information is given by other witnesses without objection.

For instance : In a prosecution for kidnapping, the refusal to strike out as hearsay testimony of the person kidnapped as to what third persons said defendant had stated to them is not prejudicial to defendant, where one of such third persons testifies to what defendant told them and it is substantially the same as the hearsay testimony.

SAME—FURTHER ILLUSTRATION.

8. In a prosecution for kidnapping a seaman, statements by a third person as to what defendant said he would do to the prosecuting witness if he attempted to board a certain ship were properly admitted over objection that defendant did not hear them, where it is shown defendant heard the important statements, though he did not hear the preliminary conversation, and afterward made practically the same statements.

EVIDENCE OF CO-CONSPIRATORS—COMPETENCY—PROOF OF CONSPIRACY.

9. Evidence of acts done by alleged conspirators in pursuance of the alleged conspiracy may be admitted before the existence of such unlawful agreement is entirely established, the order of proof being in the discretion of the trial judge. If the judge shall finally consider the showing as to the conspiracy insufficient, he should strike out the evidence of specific acts and instruct the jury to disregard it.

CRIMINAL LAW—WITNESSES—PROPRIETY OF DISCHARGING CODEFENDANTS TO TESTIFY FOR DEFENDANT.

10. The court exercised its discretion wisely in declining to discharge the codefendants under Section 1397, B. & C. Comp., that they might become witnesses for the defendant, since there was sufficient testimony to justify bringing them both to trial.

CRIMINAL LAW—INSTRUCTION AS TO INFERENCE FROM FAILURE OF CO-DEFENDANT TO TESTIFY.

11. It is not obligatory on a trial judge, under Section 1397, B. & C. Comp., to instruct a jury in a criminal case that no unfavorable inference is to be drawn from the fact that a codefendant not on trial fails to testify for the defendant.

From Multnomah. ARTHUR L. FRAZER, Judge.

Statement by MR. JUSTICE HAILEY.

This is a prosecution for kidnapping against James White and others. In February, 1903, the defendants were partners in conducting a sailor boarding house in Portland, Oregon, and also engaged in furnishing crews to vessels in that port. On the 11th of that month the prosecuting witness, Buren, a sailor, and two sailor friends, Cyren and Pearson, were in Portland, but were not staying at the boarding house of the defendants. In the forenoon of that day they went to the British consul's office and signed shipping articles with the ship Riversdale, then at anchor on the east side of the Willamette River. As they were going away from the office of the consul, the defend-

(48th Or.—27)

ants Harry White and Smith, and one Jack Grant, who was also interested in the sailor boarding house business and in furnishing crews for ships, in which latter transactions he pro-rated with the defendants, were all seen standing on a corner opposite the consul's office, and Harry White was seen to walk rapidly away down Third street. This occurred about 11 o'clock in the forenoon. Shortly afterwards these sailors met Grant and Harry White, and in answer to an inquiry told them that they, the sailors, had signed with the Riversdale, and Grant then told them to keep away from the ship, and Cyren says: "He told us that three or four times, to keep away from the ship. Harry White heard that" and also that "the two White brothers had said that they would give us a good thrashing if we went on that ship," and that Harry White was there when Grant made the last statement. About half an hour later Cyren and Pearson again met Grant and Harry White, when White said, as testified by Cyren: "He was going to give us —–—— if we went on that ship. He said we had no business to sign on her, because we were not in their house—not any of their boarding houses. He said we did not belong to their ships." After noon of that day the three sailors, Buren, Cyren, and Pearson, hired an express wagon to haul their "gear," as one of them termed his baggage, to the dock where the ship Riversdale was lying, and as they approached the dock, walking ahead of the express wagon, James White was seen there in company with three sailors, who immediately set upon them and knocked Buren down and trampled him, and assaulted and threw stones at Cyren and Pearson, who succeeded in escaping to the ship. During the trouble White stood by and told the assailants to "give him hell, boys." After Buren had been beaten, kicked, jumped upon and generally misused, White ordered the assaulting sailors to put him in the express wagon, and had him taken to the defendant's boarding house. When defendant reached the house, Buren was there sitting in a chair, and Harry White and Smith, the other defendants, were there also, and also the three assaulting sailors, who had come from the dock. One of the White brothers paid the expressman for hauling

Buren to the house. Buren was given a drink of whisky by one of the White brothers—he did not know which—and then was taken upstairs and put to bed by their order.

Testifying as to what occurred afterwards, Buren said:

"I got another whisky up there, but do not know who brought it. * * A little before dark that same night James White came to the room and asked me if I could go to Vancouver. I told him I was sick and could not go; and they said they would see about it in the morning if I was better. He said the policemen were looking for me, and the detectives would put me in jail and take me aboard that ship when it was ready to go, and I would be safer in Vancouver. * * It was after the whisky had been brought to me in the bedroom. While I was upstairs in the bedroom my stomach and head were in bad condition. * * I was sick at my stomach and had to lay down on my back, as I had to throw up when I laid down on my side. I did not take any medicine except a little white capsule the housekeeper gave me, and he gave me some whisky afterwards."

And then, speaking about going to Vancouver, witness testified:

"A fellow came up and told me to put my clothes on, we have to go to Vancouver. He said, 'A policeman will soon be up here in the house.' I said, 'I am sick. It is bad for me to go over there.' * * They told me to be quick that the policeman would soon be there. * * Smith was on the outside once when I saw out in the door. He was standing there when I was ready, and we went downstairs. Billy Smith handed me a bottle of whisky, and told me to use it if I felt weak and sick. * * When we came to Woodlawn, we had to wait there a while for a Vancouver car. When the Vancouver car came they brought me in it. *. * When we came over to the ferry, Jim White came against the stair. * * When Jim White came down to the ferry he asked me how I felt, and I told him I felt sick, and he said we might go and have a bath, and he brought me up to the barber shop there. * * Jim White told this fellow in the shop to make the bath ready and make it as hot as possible. * * And then he says, 'I will go up in town and get a room for you. I will be back in a few minutes.'"

Then, after testifying about White taking him to a hotel and getting him a room, he said:

"He brought me to bed and asked me if I wanted to have anything to eat * * and went away, * * and then came back * * and asked me how I felt and something more—I cannot

remember all—and then when he went away again he told me to put on the iron bolt inside of the door, to lock the door with the bolt. 'I will call your name and knock on the door when I come up again,' he said. * * When Jim White told me to lock the door he said something about letting nobody come in, but I can't exactly say what it was."

When asked why he went to Vancouver, he said: "They brought me over there. I could not go myself." And, when asked if he desired to go to Vancouver, Buren answered, "I could not say 'no.' I was afraid of the sailors; they were drunk." He also testified that he was taken to Vancouver in the afternoon, and the defendant James White met him at the ferry there, and White says he first saw Buren in Vancouver between 3 and 4 o'clock in the afternoon. Between 2 and 3 o'clock, and after Buren had been taken from the boarding house by two sailors whom he did not know, and one of whom accompanied him to Vancouver and left him after the defendant James White had taken him to the barber shop, the harbor master, Biglin, called at defendants' boarding house and asked Harry White where Buren was, and White said he had gone to California. That night the defendant was arrested in Vancouver, and the next day the other defendants were present in Buren's room in Vancouver when the harbor master, Biglin, and other persons were there questioning Buren. Later an information was filed against defendants jointly for the crime of kidnapping the prosecuting witness, Buren. Upon separate trial of the defendant James White, he was convicted, and appealed from the judgment of conviction to this court, and alleges numerous assignments of error.                               AFFIRMED.

For appellant there was a brief over the names of *Dan J. Malarkey* and *Pipes & Tifft,* with an oral argument by *Mr. Martin Luther Pipes.*

For the state there was a brief over the names of *A. M. Crawford,* Attorney General; *John Manning,* District Attorney, and *Robert Graves Morrow, A. C. Spencer* and *W. T. Hume,* with an oral argument by *Mr. Morrow.*

MR. JUSTICE HAILEY delivered the opinion of the court:

1. The information was filed under Section 1774, B. & C. Comp., and charged that defendants did. without lawful, or any, authority, unlawfully and feloniously and forcibly seize, confine, inveigle and kidnap one C. A. Buren, with the intent of them, the said defendants, unlawfully and feloniously to cause him, the said Buren, against his will, to be sent out of the State of Oregon and into the State of Washington. A demurrer was filed to the information, but the only ground urged at the hearing was that it charged more than one crime, "in that it charges that the defendants did forcibly seize and confine and did inveigle and kidnap one C. A. Buren." The defendant contends that there are two kinds of kidnapping under our statute—the one forcible, by seizing and confining, the other fraudulent, by inveigling—and that they are so different as to be repugnant to each other, and each constitutes a separate and distinct crime, though defined in and prohibited by the same section of the Code and punished in the same way.

Section 1774, B. & C. Comp., provides:

"Every person who without lawful authority forcibly seizes and confines another, or inveigles or kidnaps another, with intent * * to cause such other person to be sent out of this state against his will shall be punished," etc.

This court has repeatedly held that where a statute makes it a crime to do either of several acts stated disjunctively therein, all of such acts may be embraced in one count, using the conjunction "and" where "or" occurs in the statute: *State* v. *Carr*, 6 Or. 133; *State* v. *Bergman*, 6 Or. 341; *State* v. *Dale*, 8 Or. 229; *State* v. *Humphreys*, 43 Or. 47 (70 Pac. 824); *Cranor* v. *Albany*, 43 Or. 147 (71 Pac. 1042). Under this rule the commission of any one or all of the acts named in this statute constitutes only one crime, that of kidnapping. We fail to see wherein the acts charged are so different in character as to be repugnant to each other, but, on the contrary, think that the crime charged could have been committed by doing any one or all of the acts alleged. Our belief in this respect is fully sustained by the evidence in this case, which clearly shows that after Buren had been cruelly assaulted and beaten into submission by thugs under the evident control of the defendant he

was taken to the boarding house of defendants and there confined in a room and later inveigled to go to Vancouver, Washington, by the fraudulent representation that he would be arrested by officers if he failed to do so, thus showing that both the forcible and fraudulent acts of the statute could be consistently performed in committing the crime of kidnapping. The demurrer was properly overruled.

2. After 10 jurors had been accepted, but not sworn, and after the defendant had exhausted all his peremptory challenges, upon leave of the court the prosecution further examined a certain juror who had already been accepted by both parties as to his qualifications, and learned that he was related to one of the counsel for defendant and distantly connected by marriage with the defendant. In answer to a question as to whether or not the fact of this relationship would affect him in the trial of the case or cause him to be influenced in rendering his verdict, the juror said:

"No; it would not, although I go into the case at a disadvantage at the present time, as long as the question has been brought up. Yet I might have an honest opinion in his favor under the evidence that I might not have had when I went in the case. I feel that, if I had my way, I would sooner be let off."

He was then asked:

"And you think that the investigation having been opened you would be embarrassed so you would not be able to do the defendant justice?"

To this he replied, "I would like to do every one justice." The court then said, "You would prefer to be excused and not serve on this jury?" To which he answered, "Yes, sir.." The court on its own motion, and over the objection of the defendant, then excused the juror. After three more jurors had been accepted by both parties, at his own request to be excused from serving on the jury, an accepted juror, W. S. Drake, was excused by the court, who used the following language:

"I think I will excuse Mr. Drake. He has a case assigned for tomorrow morning. We will hardly finish this case today. The jury may be out all night and Mr. Drake would not be in condition to conduct his own case tomorrow.. You may call another juror."

After the juror Drake had been excused, another juror was called and examined as to his qualifications by defendant's counsel, and defendant, after such examination, asked leave to challenge such juror peremptorily, which leave was refused and defendant then peremptorily challenged the juror, but the challenge was denied for the reason that defendant had already exhausted his peremptory challenges, and exceptions were duly saved by defendant. The jury was then sworn and the cause tried. Error is assigned in excusing the two jurors after the defendant had exhausted his peremptory challenges and in denying his peremptory challenge to the last juror.

In *Kumli* v. *Southern Pacific Co.* 21 Or. 510 (28 Pac. 637) speaking of the determination of the competency of a juror, Mr. Justice BEAN says: "The determination of his competency, therefore, necessarily becomes primarily a question for the trial court, keeping ever in view, as it should, that the ultimate object to be attained is a trial by a fair and impartial jury. The question is wisely left largely to the sound discretion of that court, and its findings upon a challenge to a juror for actual bias, where there is any reasonable question as to his competency, ought not to be reviewed by an appellate court unless it clearly appear that such discretion has been arbitrarily exercised." It is the duty of the trial judge to see that a fair and impartial jury is obtained, and he may in the exercise of a sound discretion, and before the jury is complete, excuse incompetent and disqualified jurors, although no challenge or objection has been interposed and for causes not enumerated in the statute: *Commonwealth* v. *Livermore,* 4 Gray, 19; *Atlas Min. Co.* v. *Johnston,* 23 Mich. 36; *People* v. *Carrier,* 46 Mich. 444 (9 N. W. 487); *People* v. *Thacker,* 108 Mich. 658 (66 N. W. 562); *People* v. *Arceo,* 32 Cal. 40; *Sutton* v. *Fox,* 55 Wis. 536 (13 N. W. 477, 42 Am. Rep. 744). The reasons for excusing these jurors appear upon the record, and we see no abuse of the discretion lodged in the court in such matters.

In *State* v. *Boon,* 80 N. C. 462, a juror accepted by the defendant afterwards stated that he was related to both the deceased and the defendant and requested to be excused, and

the action of the court in directing him to stand aside was sustained upon appeal. In *People* v. *Carrier,* 46 Mich. 444 (9 N. W. 487), the juror was qualified, and had been accepted by both parties, but after stating to the court that he was in attendance on court as a witness in the next case to be tried, he was excused over the objection of the defendant, and the action of the court approved on appeal. In *Atlas Min. Co.* v. *Johnston,* 23 Mich. 36, under a statute providing that "the twelve first persons who shall appear as their names are drawn and called, and shall be approved as indifferent between the parties, shall be sworn, and shall be the jury to try the cause," the court, in commenting upon the meaning of this statute, said: "We think within the fair meaning of this statute, when compared with the other provisions in reference to jurors and read in the light of the decisions, that the first two jurors may properly be said not to have been approved as indifferent between the parties. And, though it would be ground of error for the court to admit a juror who is challenged and ought to have been rejected, it is no ground of error for the court to be more cautious and strict in securing an impartial jury than the law actually required, and that for this purpose the court may very properly reject a juror on a ground which would not be strictly sufficient to sustain a challenge for cause, or, in other words, when the refusal to sustain the challenge would not constitute error. So long as an impartial jury is obtained, neither party has a right to complain of this course by the court; and especially when, as in this case, no objection was taken by either party to the competency or impartiality of the jury which was obtained." In the foregoing case no challenge or objection was taken by either party to either of the two jurors excused, and they were not subject to challenge under the statute, and it was claimed by the defendant that he was entitled as a matter of right to have the case tried by the 12 jurors whose names were first drawn from the box, but the court held otherwise.

3. The only question, then, is, did the court abuse its discretion by excusing these jurors after the defendant had exhausted his peremptory challenges? In *O'Neil* v. *Lake Superior Iron*

Co. 67 Mich. 560 (35 N. W. 162), after the plaintiff had exhausted his peremptory challenges, a juror who had been previously examined and not rejected by the plaintiff requested to be excused for the reason that he did not think he had sufficient understanding of the English language to qualify him to sit as a juror, and the court excused him over the objection of plaintiff, who objected on the ground that he had already exhausted his peremptory challenges and consequently some person would be drawn instead of the juror against whom he would be debarred from exercising his privilege of peremptory challenge. The court said: "The fact that the party had exhausted his peremptory challenges before the juror was excused invaded no right of the plaintiff. * * Peremptory challenges are exercised by a party, not in the selection of jurors, but in rejection. It is not aimed at disqualification, but is exercised upon qualified jurors as matter of favor to the challenger. If, then, the party has exercised the privilege to the extent given by the statute, it cannot be alleged as error that qualified jurors are afterwards drawn or placed in the panel. His right to have his case tried before a fair, impartial and qualified jury remains unimpaired, and its selection is secured through the exercise of the challenge for cause, which still remains." The exhaustion of his peremptory challenges by the defendant in the case at bar was voluntary so far as the record shows, and the fact that the court in the exercise of its discretion excused two jurors afterward could work no hardship upon the defendant, unless he was thereafter compelled to accept as a juror some disqualified person. But the record shows that the panel was completed without challenge for cause having been made to any of the jurors accepted and a peremptory challenge only was sought to be exercised as to the last juror called. The defendant, having voluntarily exhausted his peremptory challenges, could not claim any additional peremptory challenges, and, having been tried by a qualified jury, can claim no error in impaneling the jury.

4. The errors predicated upon the admission of the testimony regarding the signing of shipping articles on the ship

Riversdale by the sailors Buren and Cyren, on the ground that such evidence tended to prove the crime of enticing seamen, which was not charged in the information, are not tenable in view of the instruction requested by defendant and given to the jury, telling them that the defendant was not charged with that crime and they could not find him guilty of such offense.

5. The objections to the testimony regarding the desertion of witnesses Cyren and Pearson from a certain ship were properly sustained. Such testimony was sought for the purpose of affecting their veracity or character. Section 852, B. & C. Comp. provides how a witness may be impeached, and expressly says, "but not by evidence of particular wrongful acts."

6. Dr. Black was called as a witness for the state, and testified that he had been a practicing physician and surgeon since 1886 and had resided at Vancouver since 1897, and had made an examination of Buren on the morning of the second day after he had been assaulted on the dock, but had not examined his body nor had any of his clothing removed, and after describing Buren's condition he was asked, "What, in your opinion, would be the cause of his condition?" An objection was made to the question as incompetent, irrelevant and immaterial, and for the further reason that the witness had not qualified himself to testify as an expert in that matter. In support of his objection the defendant relies upon the rule in *State* v. *Simonis*, 39 Or. 114 (65 Pac. 595), wherein it is said the mere fact that a witness is a regularly licensed and practicing physician in this state is not sufficient in itself to qualify him as an expert. In that case "there was no evidence that he [the witness] is a graduate of any medical school, or had taken a regular course in medicine, or had been examined by the state medical board, or as to the length of time or extent of his practice, or his experience in cases of poisoning." In this case the witness testified that he had been a practicing physician and surgeon for about 17 years; thus giving the length of time of his experience, and stating a fact from which the court could determine in some measure his qualifications as an expert, and clearly taking the case out of the rule in *State* v. *Simonis*. As stated in 8 Ency.

Pl. & Pr. 747 : "This fitness of a witness to testify as an expert is a question of fact, and is addressed in every instance to, and lies within, the sound discretion of the trial court." As to the question asked, it was competent. The witness had described Buren's condition and after doing so could give his opinion as to what caused it: *State* v. *Simonis,* 39 Or. 114 (65 Pac. 595).

7. The error assigned, if any, in overruling the motion to strike out as hearsay the testimony of Buren as to what Cyren and Pearson told him Harry White had said to them, could work no prejudice to defendant on that ground, in view of the fact disclosed by the record that Cyren himself testified to what Harry White had told him and Pearson, and it was substantially the same as stated by Buren: *State* v. *Morse,* 35 Or. 462 (57 Pac. 631).

8. It is insisted, however, that the statements made by Jack Grant to Buren, Cyren and Pearson about what the White brothers would do to them if they attempted to board the Riversdale were not admissible for the reason, first, that Harry White did not hear them and had no part in the conversation; and, second, that there was no proof of conspiracy upon which to admit the statements, and this last reason is also assigned for the exclusion of the statements made by Harry White to Cyren and Pearson about what would be done to them if they attempted to board the ship. The record, however, shows by the testimony of Cyren that; while Harry White may not have heard some of the preliminary conversation between Grant and the witnesses, he did hear the important statements and also that he himself shortly afterwards made practically the same statements to Cyren and Pearson when they met him and Grant, so there was no error in either event so far as the first reason is concerned.

9. Upon the question of the sufficiency of proof of a conspiracy, before admitting the declarations of a co-conspirator, Mr. Chief Justice MOORE, in *State* v. *Moore,* 32 Or. 73 (48 Pac. 468), after citing and quoting from several authorities, said: "From this it would seem to follow that when any evidence offered reasonably tends to create an inference of the

existence of an unlawful agreement, to the satisfaction of the judge trying the action, it would be his duty to permit the introduction of evidence tending to show the declarations and acts of the alleged co-conspirators, and thereafter to instruct the jury upon the great importance of finding that an unlawful combination had been consummated before they could consider any evidence, the introduction of which was dependent upon such finding." This same doctrine was afterward approved by this court in *Pacific Livestock Co.* v. *Gentry,* 38 Or. 275, 286 (61 Pac. 422, 65 Pac. 597), wherein it was held that the declarations of an alleged conspirator were admissible in evidence after testimony had been given which *prima facie* tended to prove the existence of a conspiracy or from which it might be reasonably inferred. Within the foregoing doctrine, there was unquestionably sufficient evidence of the existence of a conspiracy to admit the statements complained of. Mr. Chief Justice WOLVERTON, in *State* v. *Ryan,* 47 Or. 344 (82 Pac. 703), said: "The acts or declarations of one or more of the conspirators are sometimes admitted before sufficient proof is given of conspiracy. This rests, however, largely within the discretion of the trial court, but the proper connection must be subsequently made, so as to show *prima facie* a conspiracy between all, before such acts or declarations will ultimately be permitted to go to the jury." The objections to the statements were therefore properly overruled.

10. Error is also alleged in the action of the court in overruling the motions to discharge the codefendants, Harry White and Smith, so that they might become witnesses for the defendant. This, however, was a matter, based upon the sufficiency of evidence, within the discretion of the court, and we think there was sufficient evidence to sustain the ruling of the court: Section 1397, B. & C. Comp.

11. The trial court refused the defendants' request to instruct that the codefendants, Wm. Smith and Harry White, were disqualified from testifying in defendant's behalf, and that the jury should draw no unfavorable inferences from the fact that they were not witnesses for defendant, and this is assigned as

error. It is well established in this state that a codefendant not on trial cannot testify for or against a codefendant on trial, unless such codefendant has been acquitted or convicted or discharged as provided in Sections 1396, 1397, B. & C. Comp.: *State* v. *Drake,* 11 Or. 402 (4 Pac. 1204). It is claimed, however, that since the statute permits a defendant on trial to testify or not as he may choose, and his waiver of such right to testify shall not create any presumption against him (B. & C. Comp. § 1400), and, as counsel contends, the court must so instruct the jury, if requested, it necessarily before us, that the court must, when requested, instruct the jury why codefendants not on trial do not testify, and that no unfavorable inference can be drawn from this failure to appear as witnesses. Conceding, but not deciding, for the question is not before us, that the court must, when requested, instruct the jury, as counsel contends, when a defendant on trial fails to testify, does it follow that a like instruction should be given regarding codefendants who have no choice about testifying and are disqualified by the statute? We think not. The very reason of the rule invoked for the protection of the defendant on trial is wanting in the case of codefendants not on trial. The competency of a witness is entirely a matter for the court to determine, and not for the jury, and the court only is concerned with the reasons why a witness is incompetent to testify. It is purely a question of law for the court. Our statute has given to a defendant on trial the right to testify in his own behalf and at the same time declared that his waiver of such right shall not create any presumption against him. The favor to the defendant is given by the statute and is limited to his own act of testifying or not, as he may choose, and is not intended to apply to what he might say or do if testifying, or to what others testify about him or his acts or declarations. No presumption shall be created against him by reason or because of his act in failing to testify. The law does not say no presumption shall be created against him by evidence of what he may have said or done in other matters as shown by the testimony of his acts and declarations in such matters. The favor is granted the defendant in

respect to his own failure to testify, and not for the failure of some one else, whether competent or not. No such favor is extended the defendant for the act of his codefendant not on trial. So long as the codefendant cannot testify it would seem absurd to require the court to instruct the jury that no unfavorable inferences should be drawn from the failure to do what the law expressly says cannot be done.

Numerous other assignments of error are specified, but we have carefully examined the record and think that they are not well taken, and that the case was fully, fairly and properly presented to the jury by the court and no substantial right of the defendant has been affected.

The judgment of the lower court will be affirmed, and it is so ordered.                                            AFFIRMED.