Argued September 21; affirmed October 9; rehearing
denied November 5, 1934

# STATE *v.* SAVAN
(36 P. (2d) 594)

*I. G. Ankelis,* of Portland (Frank J. Lonergan and C. W. Robison, both of Portland, on the brief), for appellant.

*Lotus L. Langley,* District Attorney, and *Charles Cohn,* Deputy District Attorney, both of Portland, for the state.

BAILEY, J. On January 18, 1934, the defendants Edward Savan and Oscar Sherman were jointly indicted by the grand jury of Multnomah county for the crime of receiving stolen property. The indictment recites that said defendants on December 16, 1933, in Multnomah county then and there being, did then and there unlawfully and feloniously "buy, receive, have and conceal certain personal property, to-wit 26 suits of men's clothing, all being the personal property of Clarence Wickenden and Eric Wickenden, copartners doing business under the firm name and style of Wickenden's * * * and which said property had been lately before unlawfully and feloniously taken, stolen and carried away by certain evil-disposed persons, they, the said Oscar Sherman and Edward Savan and each of them then and there well knowing and having good reason to believe the said property to have been stolen".

Separate trials were had by the defendants. A verdict of guilty as charged was returned against Edward Savan, and from the judgment entered thereon this appeal is prosecuted.

Six assignments of error are urged, four of which have to do with the court's refusal to direct a verdict for the defendant. One assignment predicates error on the court's receiving the verdict of the jury, on the ground that two boxes which had not been received in evidence were taken from the court room into the jury room and remained there during the jury's deliberation as to the innocence or guilt of the defendant. The remaining assignment of error is based on the refusal of the court to give requested instructions and its action in giving other instructions.

During November 5 or 6, 1933, Wickenden's, a men's clothing store at Salinas, California, was broken into and entrance made through a skylight, and 115 men's suits were removed therefrom. On November 8, about noon, the 26 suits described in the indictment, which were shown to be a part of the lot taken from that store, together with other suits were shipped by the defendant Savan under the name of Ed Harris, through the agency of Hild's Transfer & Storage Company of San Francisco, by McCormick Steamship Company, consigned to Ed Harris, Portland, Oregon.

At that time, according to defendant Savan's testimony, he was in San Francisco, where he had arrived the previous night. Upon his arrival there on the evening of November 7 he attended a party and met for the first time a man by the name of Harry Daze and another man by the name of John Elmon or Elander. According to his story, he stayed with them during that night and the following night. They lived, he said, in some hotel, but he did not know the name of it or the street where it was located. He claims that he bought from these two chance acquaintances, a

few hours after meeting them, 74 suits, including the 26 suits above mentioned, and 6 overcoats, at an average price of $8 each.

He used the name Ed Harris, he said, because he had lived in San Francisco between 1910 and 1914 and was known there by that name. When he returned to Portland in 1914, he explained, he found that his family name of Savransky had been changed to Savan, and he was thereafter known by this latter name. The only people he met in San Francisco who knew him were Fred Smith, who owned and operated the Blackstone hotel in that city, and Smith's wife. He had known Mr. Smith for about thirty years, and part of that time Smith lived in Portland. After leaving San Francisco in 1914 the defendant Savan had visited that city only twice prior to his last venture, once in 1921 and another time about two years prior to November, 1933.

Two boxes containing the 74 suits and 6 overcoats so purchased by Savan arrived in Portland on November 20 and were taken by a transfer driver the same day to the Multnomah hotel and there received by Savan. They were kept there for two days in a sample room which was registered in the name of Max Harris of Cleveland, Ohio. While the goods were there some fifty to seventy-five people visited the room for the purpose of buying suits and overcoats. About two days after they had arrived at the hotel 53 of the suits were packed in one of the boxes, and this box, together with the other one, then empty, was taken to a storage warehouse by the transfer driver who had originally delivered them to the hotel.

After they had been in storage more than two weeks the same transfer man received a call from

Savan to take the box containing the suits from storage to a room in the Premier apartments in Portland occupied by Florence Maple and her brother, Joe Stefani. Before the delivery of the suits Florence Maple was notified by Savan that they would be sent there and negotiations were had which resulted in the purchase of the suits by Florence Maple for the sum of $350, although Savan at first demanded $7.50 for each suit, or a total of $397.50. All but the 26 suits involved herein were disposed of by Florence Maple before the defendant was apprehended.

The defendant Savan had for about four years prior to the date of the alleged crime been engaged in the bail bond business, and prior to that, for some fifteen years, in the jewelry business. He had never been engaged in the clothing business prior to this time. The two men who, he says, sold the suits and overcoats to him were in business as jobbers and buyers of anything.

During the trial of the case there were brought into the court room, in connection with the clothing, two boxes, one of which had the following names marked thereon: Acme Transfer Company, Los Angeles, Bush & Lang Piano House, which, according to the evidence, was an establishment in Oakland, and Hild's Transfer & Storage Company, San Francisco. This box was one in which some of the suits were shipped from San Francisco to Portland. It was identified as such by an employee of the Hunt Transfer Company of Portland, by the transfer man who delivered it to the Multnomah hotel, and in a general way by the porter and a maid at that hotel, by Florence Maple and Joe Stefani, and by the two police officers

who took charge of the box along with the clothing. There was no objection raised at the trial about the identification of this box.

The other box did not bear any marks, or at least the record fails to mention any on it.

■ These two boxes were inadvertently taken with the clothing into the jury room. When the jury returned its verdict and before the announcement thereof, counsel for the defendant objected to the receipt of the verdict, on the ground that the boxes were in the jury room without having been received in evidence. There is nothing in the record which tends to show that there was any marking on the boxes which would in any way affect the jury in arriving at the correct verdict. The defendant, as already stated, had admitted or had not denied, that the box labeled was one which he used in shipping the clothing from San Francisco to Portland. He admitted also that Hild's Transfer & Storage Company of San Francisco had forwarded the merchandise for him. Inasmuch as these two boxes had been in the court room for a considerable length of time in plain view of the jury, had been identified by different witnesses and contained nothing which could possibly have affected the jury in arriving at its verdict, the trial court did not err in receiving and filing the verdict of the jury over the objection of counsel for the defendant: *People v. Glassberg,* 326 Ill. 379 (158 N. E. 103); *People v. Hower,* 151 Cal. 638 (91 P. 507); *State v. Whalen,* 98 Iowa 662 (68 N. W. 554).

In the case of *State v. Baker,* 23 Or. 441 (32 P. 161), relied upon by the defendant, the prosecuting attorney was permitted in his closing argument, over the objec-

tion of the defendant, to read an affidavit for a continuance and to comment thereon, and the jury was allowed to take this affidavit to the jury room. The court held that this was reversible error. The facts in that case, as may be plainly seen, are entirely different from those in the case at bar.

■ The defendant assigned as ground for his motion for a directed verdict that the state had not proved any one of the material allegations of the indictment. In this respect it is contended by defendant that the state failed to prove that the clothing mentioned in the indictment was the property of the copartnership composed of Clarence Wickenden and Eric Wickenden. The evidence in this connection is undisputed that these 26 suits of men's clothing were owned by Clarence Wickenden and his brother Eric Wickenden and were taken from their store at Salinas, California, by some one who broke into and entered that store; that both of these brothers were in charge of the store and paid the expenses of its operation; that no one else had any interest in that business; and that Clarence Wickenden was "a member of the firm". Whether or not this evidence was sufficient to prove that the suits were owned by a partnership composed of Clarence Wickenden and Eric Wickenden it is not here necessary to decide. Section 13-710, Oregon Code 1930, provides as follows:

"When a crime involves the commission of or an attempt to commit a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured or intended to be injured is not material."

In construing a statute almost identical with this, the supreme court of Iowa as long ago as 1866, in the

case of *State v. Cuningham,* 21 Iowa 433, held that where the goods stolen were alleged to belong to a certain individual and the proof established that the one named and another owned the property as partners, there was not a material variance, and that the strictness of the common law rule had been changed by the statute controlling. The court, in regard to this, observed:

"The common law rule referred to is technical purely, and is supported by authority rather than reason. Our statute, throughout all its provisions, makes it the duty of courts to disregard all defects which do not prejudice the substantial rights of a defendant upon the merits. The section quoted is in entire harmony with this duty, and was intended to assist in its discharge. By this it is required that the offense shall be described with sufficient certainty *to identify the act.* This was done. The time, place, amount and description of property stolen, and the name of the person from whom it was taken—all these facts were stated with such particularity as to leave no uncertainty as to the act. Then the offense charged is for stealing *from the person* (§ 4240) and not for the felonious taking of the property of another generally. The name of the person from whom it was taken was correctly described. The error was in alleging that it belonged to this person, when it belonged to him and another, as partners. The offense was the same, the very one charged and established by the evidence."

See also: *State v. Chapin,* 74 Or. 346 (144 P. 1187), and *State v. Adler,* 71 Or. 70 (142 P. 344).

In the case of *State v. Lewark,* 106 Kan. 184 (186 P. 1002), the defendant was charged with receiving stolen property belonging to three people. The proof was to the effect that the automobile stolen was owned by the Western Land Company, a partnership com-

posed of the three individuals above mentioned. The court there held that there was no variance or inconsistency between the indictment and the proof.

*People v. Boneau*, 327 Ill. 194 (158 N. E. 431), involved a charge against the defendant of receiving stolen goods belonging to two individuals doing business as partners. At the trial of the case it was shown that a third person also had an interest in the car stolen. The court, in holding that this was not a material variance, said:

"A 'variance', in criminal law, is not now regarded as material unless it is of such a substantial character as to mislead the accused in preparing his defense, or unless it may place him in a second jeopardy for the same offense [citing authorities]. No such variance exists in this case. That the property was stolen from the Stahl store, which was definitely located, is not disputed."

In addition to the section of our code already set out attention is directed to the following:

"No indictment is insufficient, nor can the trial, judgment, or other proceedings thereon be affected by reason of a defect or imperfection in matter of form which does not tend to the prejudice of the substantial rights of the defendant upon the merits." Section 13-715, Oregon Code 1930.

"Neither a departure from the form or mode prescribed by this Code, in respect to any pleadings or proceedings, nor any error or mistake therein, renders it invalid, unless it have actually prejudiced the defendant, or tend to his prejudice in respect to a substantial right." Section 13-933, Oregon Code 1930.

The injured individuals in this case are Clarence Wickenden and Eric Wickenden. They were injured not only by the theft of the suits in the first instance

but also by the defendant's receiving them after they had been stolen. The incentive to commit robbery is very greatly heightened by the knowledge that the property wrongfully taken may be disposed of readily, and the law making it a crime to receive stolen property was intended to discourage stealing and robbing. Moreover, a copartnership, unlike a corporation, is not ordinarily regarded as strictly a legal entity distinct from the individuals composing it, or as having an independent existence, nor as a person, either natural or artificial: 47 C. J. 747. The defendant could not in anywise have been prejudiced by the failure of the state, if such failure occurred, to prove that Clarence Wickenden and Eric Wickenden were copartners.

■ It is also contended by the defendant that there is no evidence that he "knew at the time or had good reason to believe that the property was stolen" and that "there was a complete failure of proof that" he either bought or received or attempted to conceal the said property, or that he had reason to believe said property was stolen. Attention has already been directed to many of the facts in connection with the receipt of the suits by the defendant. There is also the further fact that he told one of the officers that he was selling them for Sherman and that all he got out of the transaction was $1 a suit and $31 additional for his trouble.

In addition, the proof shows that most of the 26 suits originally contained the label of Wickenden's, and that in all such instances the label had been removed. There remained, however, in many of the suits, threads which had attached the labels, indicating that such removal had been made.

In 2 Whartons Criminal Law (12th Ed.), § 1232, the law is thus stated:

"Whether the defendant knew that the goods were stolen is to be determined by all the facts of the case. It is not necessary that he should have heard the facts from eyewitnesses. He is required to use the circumspection usual with persons taking goods by private purchase; and this is eminently the case with dealers buying at greatly depreciated rates. That which a man in the defendant's position ought to have suspected, he must be regarded as having suspected, as far as was necessary to put him on his guard and on his inquiries. But it has been said that, to justify a conviction in the case of goods found, it is not sufficient to show that the prisoner had a general knowledge of the circumstances under which the goods were taken, unless the jury is also satisfied that he knew that the circumstances were such as constituted a larceny. The proof in any case is to be inferential; and among the inferences prominent are inadequacy of price, irresponsibility of vendor or depositor, and secrecy of transaction."

See, also, in this connection: *People v. Boneau,* supra; *State v. Weiner,* 84 Conn. 411 (80 Atl. 198), and 53 C. J. 536.

In the case at bar there was ample evidence from which the jury might find or infer that the defendant knew that the property received by him had been stolen.

During the impaneling of the jury, after the defendant had exercised two peremptory challenges and the state one, the trial judge at the convening of court on Monday morning announced that Mr. Frank Delano, a member of the jury, had come to him that morning in his chambers and stated that he "had an important business engagement which had broken unexpectedly

and which offered him an opportunity" for financial gain which he felt he could not ignore, and that upon such representation the trial judge had excused him. At that time the jury had not been sworn. The examination of the jurors proceeded, with permission granted to defendant's counsel to dictate into the record during recess an exception to the court's action.

The exception was based on the stated ground that the excusing of the juror was in contravention of "section 2-201 and section 2-216, chapter 2 [Oregon Code 1930], relating to 'formation of jury', * * * and section 30-108 and subsections thereunder 1 to 11 inclusive", also of article I, section 11, of the constitution of Oregon and the sixth amendment of the constitution of the United States. This exception was construed as a motion for a mistrial. Defendant's counsel also made a motion at that time for a directed verdict, on the ground that this prospective juror had been excused from further service at a time when the defendant was not present.

Thereafter the jury was sworn and the same motions were repeated by counsel for the defendant. The record, however, fails to show that the defendant exercised all of his peremptory challenges or that any juror remained on the panel who had been challenged for cause.

■ The defendant does not contend that the twelve members of the jury who heard the case were biased, partial, prejudiced or disqualified in any respect whatever. His sole objection seems to be that the jury was not composed of the twelve individuals whom he desired to hear his case. There is, moreover, nothing in the record to show that this particular juror might

not have been excused on the defendant's or the state's peremptory challenge. Inasmuch as the jury had not been sworn, the defendant had not been placed in jeopardy when this prospective juror was excused: *Ex parte Tice,* 32 Or. 179 (49 P. 1038).

■ It is the duty of the trial court to see that the defendant has a fair and impartial trial and that no member of the jury is, so far as can be prevented, prejudiced against the defendant. The defendant is not entitled to have a particular juror hear his case: *Sullivan v. Commonwealth,* 169, Ky. 797 (185 S. W. 134); *People v. Carrier,* 46 Mich. 442 (9 N. W. 487); *State v. White,* 48 Or. 416 (87 P. 137); *Richards v. State,* 36 Neb. 17 (53 N. W. 1027); *State v. Dalton,* 69 Miss. 611 (10 So. 578).

Section 2-201, Oregon Code 1930, provides the method in which the names of jurors shall be drawn from the trial jury box and what shall be done, if the ballots be exhausted before the jury is completed. Section 2-216 provides for the administration of the oath or affirmation upon the completion of the jury. And § 30-108 specifies who may claim exemption from jury service. None of these sections nor section 11 of article I, Oregon constitution, prohibits the trial court from excusing a prospective juror for sufficient reason made known to the court, before the jury has been sworn, in the absence of the defendant or otherwise.

The trial judge may, in his discretion, excuse a juror before he is sworn in a case, for any reason personal to the juror which seems to the judge sufficient. We are here referring particularly to the right of the court in instances in which the defendant is present. In *State v. White,* 48 Or. 416 (87 P. 137), after ten jurors had been accepted but not sworn and after the

defendant had exhausted all his peremptory challenges, the court excused one juror for the reason that the case might not be completed that day and that juror had a case of his own coming on for trial the following day and he might not, in the language of the court, be in condition "to conduct his own case tomorrow". In holding that no error had been committed by the trial judge, this court stated that the trial judge might excuse a juror although no challenge or objection had been interposed, "and for causes not enumerated in the statute", and that there had been no abuse of discretion. In referring to the fact that the defendant had already exercised all his peremptory challenges, this court quoted with approval from a Michigan case (*O'Neil v. Lake Superior Iron Co.*, 67 Mich. 560 (35 N. W. 162)) as follows:

"Peremptory challenges are exercised by a party, not in the selection of jurors, but in rejection. It is not aimed at disqualification, but is exercised upon qualified jurors as matter of favor to the challenger. If, then, the party has exercised the privilege to the extent given by the statute, it can not be alleged as error that qualified jurors are afterwards drawn or placed in the panel. His right to have his case tried before a fair, impartial and qualified jury remains unimpaired, and its selection is secured through the exercise of the challenge for cause, which still remains."

It has been recognized that the trial court may excuse a juror when the latter's business would otherwise be materially injured: 35 C. J., page 307, § 310. No authority has been cited and we have been unable to find any passing directly upon the question here involved, to-wit, the right of the trial judge, in the absence of the defendant, to excuse a juror after the examination of the juror but before he is sworn to try

the case and before the defendant has exercised all his peremptory challenges.

Section 13-904, Oregon Code 1930, provides:

"If the indictment be for a misdemeanor, the trial may be had in the absence of the defendant, if he appear by counsel; but if it be for a felony, he must be present in person."

A number of cases can be found in which the court holds that it is necessary for the defendant under similar statutes to be present at all times during the court proceeding, including the impaneling of the jury, and that this requirement can not be waived by the defendant in a felony case. An examination of those authorities will disclose that in many of the cases the defendant was, during the proceeding, imprisoned. This is pointed out in some detail in the case of *Diaz v. United States*, 223 U. S. 442 (32 S. Ct. 250, 56 L. Ed. 500, Ann. Cas. 1913C, 1138), in explaining a number of former decisions of that court. The opinion there further stated:

"But, where the offense is not capital and the accused is not in custody, the prevailing rule has been, that if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of his right to be present, and leaves the court free to proceed with the trial in like manner and with like effect as if he were present."

There is, without doubt, a vast difference between an action taken by the court in the absence of the defendant due to his own volition and that taken in his absence and without his knowledge and when the court is not in session. The main purpose in citing and quoting from the case last mentioned was to explain that

those adjudications which hold that any action whatever taken in the absence of the defendant renders the proceeding void are based on the particular facts in the respective cases, and that the rule announced therein is not absolute, but that the defendant in many jurisdictions may waive by his own acts the protection which the law affords him.

The purpose of throwing safeguards around the accused at all stages of the proceeding is to insure him a fair and impartial trial, by a jury of his peers. If he is confined in prison, he will be presumed to have been prejudiced if any part of the proceeding, such as the examination of jurors or the introduction of evidence, is had in his absence, even if represented by counsel. If he is absent, under such circumstances, during the examination of jurors, it is reasoned that "he might have supplied information which would have brought a different result": *State v. Moore,* 124 Or. 61 (262 P. 859). It has also been held by this court that it was erroneous to discharge a jury in a felony case when it was unable to agree on a verdict, in the absence of the defendant. One of the reasons for such holding is that had the defendant been present, he might have presented reasons because of which the court would have been "more reluctant so to act": *State v. Chandler,* 128 Or. 204 (274 P. 303). In the case last cited the defendant had been placed in jeopardy.

We are here concerned with a case in which the defendant had not been placed in jeopardy at the time the court excused one of the jurors. Instances of the defendant having been placed in jeopardy are therefore not controlling.

In considering the authorities hereinafter referred to, it must also be kept in mind that we are not con-

cerned with instances in which a juror or jurors were retained on the panel, against whom a challenge had been lodged. As was said in *State v. Miller,* 29 Kan. 43:

"We think that a trial court has, and should have, a very extensive and almost unlimited discretion in discharging a person called to serve on a jury, who might, in the opinion of the court, not make the fittest or most competent person to serve on the jury in the particular case. We can hardly see how the court could commit substantial error by discharging any person from the jury, when twelve other good, lawful and competent men could easily be had to serve on the jury. (Stout v. Hyatt, 13 Kan. 232; A. T. & S. F. Rld. Co. v. Franklin, 23 Kan. 74.) There is an immense difference between discharging a juror, and retaining him. To discharge him can seldom, if ever, do any harm; while to retain him, if his competency is doubtful, may do an immense injury to one party or the other. Hence the same rule as to competency should not govern in discharging a juror that should govern in retaining him."

In *Richards v. State,* supra, the Nebraska court quoted with approval the foregoing excerpt and enlarged upon the fact that there is a vast distinction between retaining and discharging a juror. In *State v. Dalton,* supra, the state was allowed a fifth peremptory challenge, although only four were sanctioned by statute. Referring to this procedure, the court observed:

"The action of the court in permitting to appellees a fifth peremptory challenge was erroneous, but the error is not reversible. The plaintiff, as has long been held in this state, had no vested right in any particular juror. He had a right to an impartial jury, and this right seems to have been enjoyed by him. We decline, moreover, to reverse, because another trial, properly conducted, could only result in a judgment for the appellees, on the evidence before us."

The court in *Sullivan v. Commonwealth,* supra, had this to say relative to the discharge of a juror:

"Complaint is also made of the fact that one of the jurors was excused after the panel had been made up and he had been accepted by both sides. It appears, however, that this action was taken by the court before the jury was sworn to try the case and before the defendant had pleaded to the indictment. Clearly at this stage of the proceeding the excusing of a juror was a matter that addressed itself to the sound discretion of the court. The record does not disclose why the juror was excused. In the absence of a showing to the contrary, we must assume that he was excused for a valid and sufficient reason. Under the circumstances, it can not be said that the trial court abused a sound discretion, or that defendant was prejudiced by the court's ruling in excusing the juror."

*Commonwealth v. Payne,* 205 Pa. 101 (54 Atl. 489), involved an objection to the method of selecting the jury. The court disposed of the alleged error briefly in the following language:

"The next assignments of error are to the calling of the jurors summoned as *tales de circumstantibus* one at a time. This was within the discretion of the court. There is no right in a prisoner to have any particular man or men on the jury, or any particular set of men from whom to select. His right is only to have the proper number of jurors, 'good men and true', as the common-law phrase was, to sit upon his case."

In *State v. Reilly,* 25 N. D. 339 (141 N. W. 720), after stating that parties litigant have a right to a jury of the original panel as far as practical to obtain it and that "the court has no right to arbitrarily discharge the regular panel without cause and summon another", the opinion says:

"But the cases which hold to this proposition fall far short of holding that error is committed where a

court, for reasons of its own, has discharged a portion of a panel and either provided for the calling of talesmen or for an additional panel to fill the vacancies, especially where there is no proof or suggestion of partiality on the part of such court, or of any real prejudice to the defendant. The real thing to be guarded against is the denial of an impartial jury of one's peers, and there seems to have been no such denial in the case at bar.''

The opinion in *People v. Ferguson,* 124 Cal. App. 221 (12 P. (2d) 158), discusses at some length the rights of a defendant in a criminal case and concludes as follows:

''There is here no complaint that the jurors who served were not competent, fair, and qualified to act. Therefore, assuming that the examination of members of the panel took place without the presence of appellant, and further indulging in what we believe is an incorrect assumption, viz., that such proceedings formed part of the trial, nevertheless, in the absence of a showing that the jurors who were selected to try the case were not competent, or fair, or qualified to act, appellant is not entitled to rely upon the claimed error as one which requires a reversal of the judgment.''

In *Howard v. Kentucky,* 200 U. S. 164 (26 S. Ct. 189, 50 L. Ed. 421), a juror was discharged after his examination in the absence of the defendant. Although the facts there are not the same as in this case, nevertheless the language of the court is decidedly appropriate here, to the effect that:

''Of what does plaintiff in error complain? The discharge of a juror before he was sworn and the absence of the plaintiff in error from the examination of the juror by the presiding judge. But plaintiff in error consented through his counsel to the examination, and there is not an intimation that the juror selected in Alexander's place was not as competent as he. Nor can we say that the discharge of Alexander took from

the other jurors who had been chosen their competency to try the case or to give to plaintiff in error the right to a new panel. In Hayes v. Missouri, 120 U. S. 68, it was said: 'The accused can not complain if he is still tried by an impartial jury. He can demand nothing more. Northern Pacific Railroad v. Herbert, 116 U. S. 642. The right to challenge is the right to reject, not to select a juror. If from those who remain an impartial jury is obtained, the constitutional right of the accused is maintained.' Brown v. New Jersey, 175 U. S. 172.''

The supreme court of Mississippi in *Thomas v. State,* 117 Miss. 532 (78 So. 147, 150, Ann. Cas. 1918E, 371), after calling attention to the lack of opportunity in the past to one accused to have a fair and impartial trial, remarked upon the present trend toward guarding his rights so zealously that the courts have become ''fettered with technical rules and shackled with these rights and safeguards of the accused'', with the result that ''it is indeed difficult for a conviction to be had without some error, technical or substantial, appearing therein'', and said:

''This situation in criminal procedure, in this enlightened and progressive age, should not exist, but those errors only in the trial of the case which deprive the accused of some substantial right should be held reversible error. The pendulum should not be swung to the extreme in either direction, but there ought to be a happy and safe medium between the extremes where the rights of the accused will be safeguarded to the extent only that he receive a fair and impartial trial upon the merits of his case. Technical errors which amount to errors in form and shadow, and not in substance, should be viewed by the courts only in determining whether the accused has received a just and fair trial; and the whole record of the case should be looked to and a conviction be permitted to stand, unless it appear that the error complained of has caused a substantial injustice to be done the accused, in which

event the courts should readily and promptly grant a new trial, thus, after all, securing to the accused the full benefits of a fair and impartial trial as guaranteed to him by the law of the land.''

Section 13-904, supra, providing for the presence of the accused at the trial in all felony cases, is a part of the Criminal Code of 1864. That same code contains § 13-933, supra, which enjoins us to disregard any errors or mistakes ''in any pleadings or proceedings'' unless the rights of the defendant have been prejudiced or unless such errors or mistakes tend ''to his prejudice in respect to a substantial right''.

6. The record fails to disclose any reason why the trial judge should have acted so hurriedly in this affair, or should have listened to the request of the juror in his chambers in the absence of the defendant and the district attorney. Matters of this nature should be transacted in open court. Although we think the procedure adopted was, to say the least, irregular, nevertheless we are not willing to reverse the judgment for that reason. We find that the defendant has had a fair and impartial trial; that his rights have not been prejudiced by the action of the trial court; and that under the mandate of § 13-933, supra, this alleged error should be disregarded.

As a sixth assignment of error the defendant states generally that the court erred in giving or refusing to give instructions. However, his objection in this respect is not pointed out definitely. We have read the entire testimony and the instructions, and we find that no prejudicial errors were committed.

The judgment is affirmed.

RAND, C. J., and CAMPBELL and ROSSMAN, JJ., concur.