Johnny Lee GOSS, Appellant,

v.

STATE of Alaska, Appellee.

No. 124.

Supreme Court of Alaska.

March 21, 1962.

M. Ashley Dickerson, Anchorage, for appellant.

George N. Hayes, Dist. Atty., and James C. Merbs, Asst. Dist. Atty., for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

The defendant appeals from a judgment of conviction under an indictment charging him with the burglary of a hardware store in one count and larceny of $2000 in a second count.

The briefs submitted both by the defendant and the state are poorly written and lack the clarity and conciseness called for by the rules of this court.[1] The helter-skelter arrangement and treatment of the questions presented leave much to be desired. In several instances the facts in the record have been distorted, and even misstated, to fit the particular proposition being advanced by the writer of the brief. Principles of law are announced without any supporting authority and in some instances without having any bearing upon the issues raised. It is only because a man's liberty is at stake that we take the time to consider the appeal at all.

There appear to be three questions presented for review. The first of these relates to the sufficiency of the evidence to sustain the conviction. At the close of the state's evidence, which was all circumstantial, the defendant moved for judgment of acquittal as to both counts. The motion was denied. Since the state was the prevailing party below on the challenge by the defendant to the sufficiency of its

1. Supreme Ct.R. 11 requires that the brief contain "a concise statement of the case"; a "succinct, but accurate and clear," summary of argument; and then the argument itself, "stating clearly the points of fact and of law being discussed."

evidence, we need consider only those facts in the record most favorable to the state and such reasonable inferences as the jury may have drawn from them.[2]

The record discloses that at about seven o'clock on the morning of December 21, 1960, Robert C. Reeve, owner of the Kennedy Hardware Store and Reeve Aleutian Airways, Inc., arrived at the Airways office and discovered that someone had broken into the hardware store during the nighttime and had rifled the office safe and the gun section of the store. The businesses were conducted in adjoining buildings connected by a common doorway. The safe was on casters and had been rolled from its usual place in the store office into the packing room at the rear of the store and there tipped over onto its back side. It weighed between 200 and 500 pounds, but could have been handled by one man. The doors of the safe had been pried open with a crowbar. Cash was missing from the safe in the amount of $325 or more, in addition to some checks and sales slips. Several of the checks were later found in the debris on the premises.

Police officers arrived to investigate the crime, within less than an hour after its discovery by Mr. Reeve. Their testimony substantiated the story told by Reeve as to the visible evidences of a burglary and larceny. They also told of finding a boot-print upon the top of a display stove which stood beside the overturned safe. They described the print as showing a sole of a very pointed design and a very narrow heel. They lifted the print with scotch tape and transposed it to a piece of cardboard. The print was then outlined on the cardboard with purple ink. This outline was later compared with a cowboy boot identified as belonging to the defendant, and the officers testified that the worn por-

tion[3] of the defendant's boot corresponded exactly with the purplish outline on the cardboard.[4]

Safe insulation was found lying loose inside and around the safe, apparently dislodged from the walls of the safe by the thief when he pried open the doors. Some of this insulation, and also some paint samples, scraped by the officers from the outside surface of the safe doors, were gathered up and sent to the F.B.I. laboratories for analysis and comparison.

Further investigation led the officers to the house where the defendant was staying. They found him at home at about 4:00 P.M. on December 22, 1960, and walking around on crutches, with his left foot in a bandage. He explained that he had hurt his foot on the night of December 20, while helping a woman, Williett Young, build a concrete wall. It should be noted here that on this same day he gave two other versions of how he injured his foot. The first was that he dropped a piece of culvert on it while helping Williett do some janitorial work, and the second that he dropped a concrete pier on his toe while assisting a man to unload some concrete piers from the back of a truck on December 20.

At the time of their first meeting with the defendant, the officers noticed a pair of cowboy boots on the floor. The top of the foot portion of the left boot had been cut away, but the sole was still intact. Goss stated that the boots were his. In fact they were the only footgear he owned. From a garbage can outside the house, the officers retrieved two pieces of leather which were identified as having been cut from the subject boot. These pieces of leather had little spots of blood on them.

While the officers were talking to the defendant, Williett Young drove into the yard. Her car was immediately searched

2. Davis v. State, 369 P.2d 879 (Alaska, March 13, 1962).

3. In its brief the state refers to the worn portion of the sole as that part of the sole which strikes the ground.

4. At the time of the trial, the dirt or dust of the print lifted from the stove had completely disappeared and only the purple outlines drawn on the cardboard remained.

by one of the officers, under a search warrant obtained earlier. The officer stated that he observed blood on the right front floormat and therefore seized it under the warrant. Another officer testified that from shortly after midnight until about 4:30 o'clock on the morning of December 21 he had observed Williett Young in her car parked across the street from the office of Reeve Aleutian Airways. When questioned by the officer as to her reasons for being there, she stated that she was waiting for a friend who was at the D & D Bar gambling. The bar was checked for gambling activities but the results were negative.

The defendant was taken to the police station at about 5:00 P.M. on December 22 and placed under arrest at about 9:00 P.M. At the station he was relieved of his boots, the one sock he was wearing, his sweater and his jacket. These items were also sent to the F.B.I. laboratory. It is not clear from the record whether they were all taken from the defendant before or after his arrest.

At some time between 4:00 and 5:00 P.M., on December 21, the defendant appeared at a doctor's office for examination of his injured foot. The doctor testified in part as follows:

"* * * When I looked at his foot, it had apparently been bandaged by someone * * * and it had a rather large, bulky bandage on it. The toe was very severely smashed by a crushing type of injury * * * his toe was very severely split open. * *"

It was the doctor's opinion that the toe had been injured about six to thirty-six hours before he examined it. In his words "it was not the type of an injury that happens as we often see someone slams their finger in a car door and they come in within an hour or so, and it looks fresh."

By the testimony of expert witnesses from the F.B.I. laboratory, the state es-

tablished that numerous tiny particles of paint removed at the laboratory from the defendant's sweater were of the same color, texture, finish and thickness as the top surface layer of the paint specimens scraped from the safe doors by the police officers. In the same manner the state established that particles of insulation material removed at the laboratory from the defendant's sock and sweater [5] were of the same appearance and composition as the safe insulation specimens obtained from Mr. Reeve's safe.

■ We find that the evidence just related and the reasonable inferences to be drawn from it justify the conclusion that the defendant entered the Kennedy Hardware Store with the intent to commit larceny and that he forced open the safe on the premises and stole money therefrom. In this connection we quote with approval and apply to the facts of this case the following statement from an opinion of the Supreme Court of the State of Montana:

"* * * Here no one fact can be said to establish the defendant's guilt, but all the circumstances, many of them unimportant standing alone, taken together and unexplained, are sufficient to support the verdict." [6]

■ The second question raised by the defendant, as nearly as we can make it out from his "Statement of Points Relied On" and his brief, is whether the taking of his clothing by the police was without probable cause and therefore amounted to an unreasonable search and seizure. Rule 37(c) of the Rules of Criminal Procedure provides that a person aggrieved by an unlawful search and seizure may on any of the grounds stated in the rule move for the return of the property and to suppress for use as evidence anything so obtained. If the motion is granted, the rule requires that the property shall be restored and declares that it shall not be admissible at any hearing or trial. We have carefully searched·

5. There were only two particles of insulation material recovered from the sweater, and only one from the sock.

6. State v. Espelin, 106 Mont. 231, 76 P. 2d 629, 631 (1938).

the record but fail to find that the appellant ever made the motion called for by Rule 37(c) at any stage of the proceedings in the lower court. As a matter of fact the record discloses that the boots, sock, and sweater, taken by the police from the defendant at the police station, were all received in evidence under the repeated assertion by defendant's counsel of "No objection."[7] We find no error in the trial court's admission of the defendant's clothing into evidence.

The third question presented is whether it was error for the court to refuse, over defendant's objection, to publish the first verdict of the jury. What happened was that, when the jury returned with a verdict, the trial judge pointed out to them that they had been directed by him to ascertain the exact amount of money taken. They had evidently failed to make this determination with respect to the larceny count, for the judge now gave them a new form of verdict (identical with the form which he gave them when they were first sent out to deliberate) and returned them to the jury room to make the necessary determination. Then, in a conference at the bench, the judge apparently announced that he was not going to reveal the verdict. To

this defendant's counsel objected, but the grounds of his objection, if he gave any, do not appear in the record.[8] The unpublished verdict was ordered to be sealed up by the court and not to be opened again except by order of the court.

The defendant now argues that the refusal of the trial court to permit him to see the first verdict was an invasion of his Constitutional right to a public trial. Citing Kendall v. State,[9] he contends that where a verdict is so bad or defective that no judgment can be rendered thereon, or where it finds no fact from which a legal conclusion as to guilt can be deduced, the verdict should be set aside and a new trial granted. That is precisely what would have been required if the judge had accepted the defective verdict and ordered it filed. He, no doubt, had in mind the mandate of section 66-13-72 A.C.L.A.1949 that, when an indictment charges an offense against any property by larceny, the jury, on conviction of the defendant, shall ascertain and declare in the verdict the value of the property stolen. That is most important because under our larceny statute,[10] if the value of the money or other property stolen does not exceed $100, the offense is petit larceny and draws only a fine or jail sen-

7. At the time of oral argument before this court, counsel for appellant suggested that the United States Supreme Court in the recent case of Mapp v. Ohio, 367 U.S. 643, 659 n. 9, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081, 1092 n. 9 (1961), seemed to indicate that no motion in the trial court is necessary to raise the question of unconstitutional search and seizure on appeal. Quite to the contrary, the Supreme Court in the Mapp case specifically stated that "As is always the case, however, state procedural requirements governing assertion and pursuance of direct and collateral constitutional challenges to criminal prosecutions must be respected."

8. The transcript of the trial proceedings in this case indicates that the conference at the bench over defendant's objection to the court's refusal to publish the first verdict was inaudible due to noise in the courtroom, to the court and counsel speaking in low tones, and to the shuffling of papers. We assume that this whis-

pered conference at the bench was occasioned by the jury being still present in the courtroom or being in the process of leaving. The same situation has been evident in other transcripts on appeal and in nearly every instance a garbled record comes up to us, usually on some important part of the trial procedure. The last sentence of Civ.R. 51 was designed to avoid softly spoken conferences at the bench, inaudible to the clerk transcribing from the electronic recorder, by the provision that "opportunity shall be given to make the objection out of the hearing of the jury, by excusing the jury or hearing objections in chambers." We urge our trial judges to voluntarily comply with the rule and that counsel be not hesitant in insisting upon such compliance.

9. Kendall v. State, 183 Ind. 162, 105 N.E. 899 (1914).

10. Section 65-5-41 A.C.L.A.Cum.Supp. 1957.

tence, otherwise it is grand larceny punishable by a term in the penitentiary.

■ We find that the action of the trial court under the circumstances was in the interests of the defendant and was fully justified to clear up the situation resulting from the return of the defective verdict.[11] We note in passing that the defendant had the jury polled after they returned with their second verdict and the same had been published and filed. On the poll each juror stated that the verdict so published and filed was his true verdict.

One final matter not specifically mentioned in the defendant's statement of points, specification of errors or questions presented, but nevertheless argued by both parties in the briefs is the defendant's contention that there was a fatal variance between the pleadings and the proof in that the indictment alleged that the stolen money was the property of Reeve Aleutian Airways, whereas the testimony showed that it belonged to Kennedy Hardware Store.

■ We find no merit in the defendant's claim as to a fatal variance. There is a sufficient allegation in count two of the indictment to apprise the defendant that he is being accused of taking money which did not belong to him and that is the gist of the offense.[12] It is an uncontradicted fact in the record that Mr. Reeve was the owner of both the Kennedy Hardware Store and the Airways corporation. Under those circumstances we find that the larceny transaction is sufficiently identified so that the defendant, by proper plea, may protect himself against another prosecution for the same offense.[13]

The judgment is affirmed.

11. See State v. Hodge, 173 La. 128, 136 So. 291 (1931).

12. See Griggs v. United States, 158 F. 572, 575 (9th Cir. 1908).

13. See State v. Chapin, 74 Or. 346, 144 P. 1187, 1189 (1914), citing State v. Nelson, 11 Nev. 334; State v. Savan, 148 Or. 423, 36 P.2d 594, 596–597, 96 A.L.R. 497 (1934). See also sections 66–9–10 and 66–9–15, A.C.L.A.1949, which respectively declare that the erroneous allegation in an indictment as to the victim is not material if the commission of a private injury is described with sufficient certainty in other respects to identify the act, and that an indictment is not insufficient or the trial, judgment or other proceedings thereon affected by reason of a defect or imperfection in the matter of form which does not tend to the prejudice of the substantial rights of the defendant upon the merits.